**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**IN ADMIRALTY**

**CLEAR SPRING PROPERTY AND**
**CASUALTY COMPANY**,

     Plaintiff,

                                 Case No. 1:21-cv-24234-RKA

vs.

**WELLO AND MOM, LLC**,

     Defendant.

_____/

**DECLARATION IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. §1746, Beric Anthony Usher declares and states as follows:

1.  My name is Beric Anthony Usher.  I am over 21 years of age and otherwise competent to make the statements set forth herein.

2.  I have personal knowledge of all matters contained in this declaration.

3.  I reside at Woodroyd, Pateley Bridge, Harrogate, North Yorkshire, United Kingdom.  I have been employed in the marine insurance industry for over forty (40) years and for over thirty (30) years have specialized in providing Yacht and Motor yacht insurance policies.

4.  At all times material hereto, I was employed as Managing Director and Senior Underwriter for Concept Special Risks Ltd. (hereinafter "Concept") or Concept's predecessor entity, Osprey Special Risks Ltd., (hereinafter "Osprey") a marine insurance underwriting firm incorporated in the United Kingdom.  I have nearly thirty years of experience as an underwriter for Concept, and its corporate predecessors.

5.  As Managing Director and Senior Underwriter for Concept, I was responsible for the entire underwriting department and for all personnel involved in the yacht and pleasure boat

1

account which Concept wrote on behalf of Plaintiff CLEAR SPRING PROPERTY AND CASUALTY COMPANY (hereinafter "CLEAR SPRING") during the time in which Policy No. CSRYP/204845 was issued to Defendant WELLO AND MOM, LLC (hereinafter "WELLO") and insuring the vessel "LOLOTTE" (hereinafter "the Vessel").

6.  My duties with Concept included making the final determination as to whether, on what terms, and for what premium marine insurance coverage will be agreed to with respect to any particular risk that is submitted by a broker to Concept.

7.  I have reviewed, and I am very familiar with, the application materials which are contained in the Underwriting File for the Policy CSRYP/204845 (hereinafter "the Policy").

8.  I have reviewed, and am very familiar with, the documentary evidence generated in the course of the above captioned litigation, including, but not limited to, the deposition transcript of Amelina Cisneros and Roy Cisneros.

9.  My affidavit is based upon my review of these documents, upon my personal knowledge of Concept's underwriting practices, and upon my first-hand knowledge and review of WELLO's insurance application documents submitted by brokers acting on their behalf.

10. At all times relevant hereto, Concept was the authorized underwriting and claims handling agent for CLEAR SPRING as regards issuance of the Policy which afforded coverage for the Vessel.  As an authorized underwriting agent, Concept's role was to receive and then evaluate applications for the marine insurance coverage that we were authorized to write. Concept would then either issue a quote to the surplus lines broker on the basis of the information contained in the application and any supporting materials, or else Concept would refuse to issue a quote and would thereby reject an application for marine insurance.

11. Such applications would normally be forwarded to our offices via email from the various insurance brokers located in the United States with whom we establish business relationships.  In the case of WELLO, all communications with Concept were through Casey Insurance Group, acting as the agent of WELLO.

12. The role of the brokers, such as Casey Insurance Group, is to submit to Concept applications and requests for quotations on prospective policies of marine insurance.  After a prospective insured completes the application, it is sent via the broker to our facility in the United Kingdom for my review and underwriting decision.

13. Casey Insurance Group did not at any time act as an agent for Concept or CLEAR SPRING and at no time did Casey Insurance Group have authority to bind Concept or CLEAR SPRING.

14. No insurance broker is or ever has been authorized to bind either Concept or CLEAR SPRING.  The decision to bind on any prospective risk must come from Concept and this decision is then transmitted to the insured's agent only after Concept has reviewed and approved the application.

15. On the 2018 Application, in response to the specific inquiry whether any insurance had been declined, cancelled or non-renewed in the last 5 years, WELLO answered "NO."

16. On the 2018 Application, in response to the specific inquiry whether the insured or any named operator had been involved in a loss in the last ten years, WELLO answered, "NO".

17. On the 2018 Application, in response to the specific inquiry whether Roy Cisneros had been involved in a loss on the last ten years, WELLO answered, "-NONE-".

18. In reliance on the truth of the material facts disclosed on the 2018 Application, Concept issued to WELLO Policy No. CSRYP/169671.

19. On the 2019 Renewal Application, in response to the specific inquiry whether Roy Cisneros had been involved in a loss in the last ten years, WELLO answered, "None".

20. In reliance on the truth of the material facts disclosed on the 2019 Renewal Application, Concept issued to WELLO Policy No. CSRYP/177227.

21. On the 2020 Renewal Application, in response to the specific inquiry whether Roy Cisneros had been involved in a loss in the last ten years, WELLO answered, "None".

22. In reliance on the truth of the material facts disclosed on the 2020 Renewal Application, Concept issued to WELLO Policy No. CSRYP/183480.

23. On the 2021 Renewal Application, in response to the specific inquiry whether Roy Cisneros had been involved in a loss in the last ten years, WELLO answered, "None".

24. In reliance on the truth of the material facts disclosed on the 2021 Renewal Application, Concept issued to WELLO Policy No. CSRYP/204845.

25. Believing that all questions on the Renewal Questionnaire had been answered accurately and that all material information had been disclosed, the underwriter working under my direct supervision at Concept, Neil Burton, issued on behalf of CLEAR SPRING Policy No. CSRYP/204845, affording $230,871.00 in first-party property damage coverage for the Vessel against the risks detailed therein, subject to the Policy's terms, conditions, warranties, and exclusions.

26. Despite making specific inquiry, nothing on the 2018 Application, the 2019 Renewal Application, the 2020 Renewal Application, or the 2021 Renewal Application indicated that in fact the Vessel had suffered two prior losses, the first in 2016 and the second in May 2018.

27. The prior loss in 2016 had occurred under a policy issued through Concept (or its corporate predecessor, Osprey) with insurance company Great Lakes Insurance SE. Underwriters denied coverage for the 2016 loss due to lack maintenance, after which Underwriters issued a non-renewal and declined to renew coverage for the Vessel for the following year.

28. When the Defendant presented its initial request for coverage in 2018 (seemingly for the first time) through its agent Casey Insurance Group, the Casey Insurance Group application disclosed the name of the corporate entity as "Wello and Mom, LLC." Although we are not required to do so, we typically perform a search of our records to determine whether we have previously written a policy with any prospective insured. I believe we did not connect the 2016 loss to this Insured purely and simply because our database is enormous, and the previous policy insured "Wello & Mom, LLC." Unfortunately, because the database contains literally hundreds of thousands of records, relevant results are only returned if the spelling is identical. Thus, if you enter "Wello and Mom," it's simply not going to return results related to "Wello & Mom," and so Underwriters did not connect the two.

29. The prior loss in May 2018 was with an entirely unrelated insurer, Hiscox, Ltd.

30. The Policy states, in relevant part:

**9. General Conditions and Warranties**

h) If you have used a broker to effect coverage, it is hereby agreed that your brokers or any substituted brokers (whether surplus line or otherwise), shall be deemed to be exclusively the agents of you and not of us in any and all matters relating to, connected with or affecting this insurance….

[….]

m) This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstance material to our acceptance or

continuance of this insurance. No action or inaction by us shall be deemed a waiver of this provision.

31. My policy as Senior Underwriter at Concept is to insist on a personal review of any application disclosing prior losses.  The reason for this practice is to allow me as Senior Underwriter to make the judgment as to how much additional premium to charge or whether coverage should be declined.

32. When a quotation request or application comes into our facility for review, we have no ability to judge the nature of the risk being presented by any means other than the information disclosed by the prospective insured.  Accordingly, we rely entirely on the veracity of the information submitted to us by the insureds and their brokers and we rely entirely on their compliance with the critical obligation imposed under federal admiralty law by the doctrine of *uberrimae fidei* or "utmost good faith."

33. The various applications submitted over multiple years included questions specifically inquiring into the loss history of the insured and/or the named operators because, as a prudent and intelligent underwriter with over forty (40) years of experience in the marine insurance industry, it is my judgment that these facts are the among the most germane to deciding whether to issue a policy, what premium to charge, and what terms and conditions to require.

34. Accurate responses to the specific questions regarding the loss history of the insured and/or the named operators are material because they could and likely would influence the mind of a prudent and intelligent underwriter in determining whether to accept the risk because these past events are the best (and sometimes only) indicators of future risk.  Therefore, truthful answers to these questions are material to my decisions as a prudent and intelligent underwriter because false answers would only result in a faulty evaluation of the risk.

35. The matter of an insured's loss history and/or a named operator's loss history, whether he or she was at the helm when such a loss occurred or not, is always of concern to Concept, and to any reasonable underwriter, as it is an indicator of the insured's care and skill in managing and maintaining the vessel, and it is the best indicator of the likelihood of future losses.

36. In accordance with guidelines printed in Concept's Underwriting Manual,

    In many respects, a vessel is only as good as its owner. This is not just an observation about the owner's skill in operating the vessel but also how he maintains her and supplies and crews her. There are also implications deriving from the character of the owner and any crew he may employ. From time to time, the question of what is a material fact? Is raised and the answer put simply is anything that might influence our perception of a risk is material.
    [….]
    *If an owner has had previous losses, these must be taken into consideration when deciding whether or not to offer terms and these will impact the price charged*.

    A true and correct copy of the Underwriting Manual is attached as Ex. 1 (emphasis added).

37. Had WELLO truthfully disclosed on any of the various applications that the Vessel had suffered a prior loss in 2016, been non-renewed, and then suffered another loss in 2018, Underwriters would not have issued the Policy, or indeed any policy, because as senior underwriter I felt strongly enough to non-renew the 2016 policy due to the claim being caused by lack of maintenance as opposed to a fortuity. The subsequent claim in 2018 endorsed this decision.

38. Had WELLO truthfully disclosed just the prior loss in 2016 and the subsequent non-renewal, Underwriters would not have issued the Policy, or indeed any policy, because an insured who was not acceptable to me in 2017 would also not be acceptable in 2021 and indeed with the undisclosed claim in 2018 would have been even more unacceptable.

have been careless, negligent on my part to have been made aware of the two prior losses and to have simply ignored them.

40. CLEAR SPRING is an admitted, licensed insurance carrier in the State of New York.

41. CLEAR SPRING maintains bank accounts in the State of New York State.

42. CLEAR SPRING accepts service of process through attorneys in the State of New York.

I declare or certify, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 13ᵀᴴ day of February, 2023.

B.A. Usher

8

# Exhibit 1



# Underwriting

# Manual

**Unity House**

**#2 Station Court**

**Station Rd**

**Guiseley**

**LS20 8EY**

**Concept Special Risks Ltd**

+44 (0) 1943 882 700 · www.special-risks.co.uk

Unity House · 2 Station Court · Station Road · Guiseley · LEEDS · LS20 8EY · United Kingdom

Registered in England and Wales · Company no 00952756

Authorized and regulated by the Financial Services Authority · Firm no 312098

**Concept Special Risks Ltd.**

**Underwriting Manual**

## 1. Introduction

This manual is written for your help and assistance, it is intended for use with the current rating guide, and thus gives no guidance as to pricing only to the underwriting and risk analysis philosophy of Concept. Ultimately, risk selection and rating are left to the discretion of the individual underwriter subject to the current rate guides and the restrictions on vessels and owners set out in this manual and any underwriting decisions that may be taken from time to time by the Board of CSR or at underwriting meetings. The majority of the restrictions on vessel value, use and type given in this manual reflect the agreements in place with our underwriters.

As an underwriting agency, we owe a duty of care to the underwriters who ultimately we commit to risks and we must always take their interests into account when considering the acceptance or rejection of a risk. In doing this, we must also as underwriters be fully cognisant of the contractual boundaries put in place by our agreements with our underwriters.

## 2. Risk Selection

In considering whether or not to quote any risk we should first ensure that that we are contractually able to offer terms on the specific vessel.

Our contracts allow us to underwrite any vessel used for recreational purposes with an agreed value of US$2,000,000 or less. Thus the usage and the valuation must fit into these parameters before we are able to give more detailed consideration to the vessel or vessels concerned.

If the vessel is acceptable, we must then consider the risk in more detail. There are two principle aspects to any yacht risk, the vessel itself and the owner and there are various questions to be asked about each of these in order to establish acceptability and following that, price. All underwriting is about looking for patterns where in certain circumstances there is a reasonably predictable outcome, for example, we would expect a teenager at the wheel of a Porsche to be a prelude to a disaster. In the same fashion, we view certain types of vessel as completely unacceptable and certain owners and operators as also completely unacceptable. Sometimes, we will take a view that by dint of past experience an owner/operator who may be perfectly acceptable for some vessels is quite wrong for others. It should be stressed, however, that Concept <u>NEVER</u> discriminate on the grounds of race, gender or sexual orientation when making risk assessments or in any other aspect of our business, we do however, take into account age and potential infirmities in making underwriting decisions regarding the capabilities of operators. It should also be stressed that the questions posed in the application are all extremely important in the consideration of the acceptability of any risk. You must study the information provided on the application very carefully when assessing the desirability of any offered risk.

(i)    Vessel Acceptability

Generally, there are few generic types of recreational craft we will not even consider. As a general principle, we look to underwrite vessels manufactured in accordance with established standards by boat builders of repute. We do not as a rule write custom built vessels in the sense of those that are essentially "home-made" and neither do we write vessels that have been modified in a way that breaches the manufacturer's recommendations, for example by the addition of extra or unsuitably powerful engines. There are some types of vessel that we will not accept such as ferro-cement hull yachts, trimarans and vessels capable of maximum design speeds in excess of 90mph. Should you be asked to offer terms on any vessel you believe falls into any of these categories or is in some other way outside of what we would normally deem acceptable you should either simply decline to quote or refer the matter to a Director involved in Underwriting.

There are of course, many factors that affect the desirability of a risk and generally speaking, if a vessel (and its owner) fall into an acceptable category, then desirability is accounted for by adjustment to price, thus the less desirable and therefore greater the risk, the more premium is charged. Pricing issues are dealt with in the rate guide and will change from time to time to enable us to adapt to market circumstances on behalf of our underwriters. Valuation is often a difficult subject as the true value of a vessel is only what a willing buyer is prepared to pay for it. It is worth remembering however, that the purpose of insurance is to enable someone to be put back into the condition they enjoyed prior to a loss, therefore, we do not insure vessels for more than their purchase price to the current owner without evidence in the form of receipts of genuine investment to increase the vessel's value (as opposed to the cost of routine maintenance such as bottom painting etc.) There may well be a survey that is presented that shows a market value of far more than what was paid and this may be an accurate reflection of what the vessel might fetch if sold. We will not accept such a survey as grounds for an increase in insured value however, as in the event of a loss the insured could potentially profit from his insurance which is not the intent of the policy or indeed, the industry. Occasionally, there are market circumstances prevailing that require a degree of flexibility in order to obtain a realistic premium for underwriters on an under-priced vessel but we must know full details of the purchase price to consider any such requests.

(ii)     Owner/Operator Acceptability

The fundamental doctrine that underpins all contracts of marine insurance is that of "utmost good faith." This requires that the parties to a contract of marine insurance observe the highest standards as to truth regarding material facts. Put another way, this means that we must be able to have complete confidence on behalf of our underwriters, that the information that is provided by any insured is correct and complete. The other side of this coin is that the insured should have complete confidence that we will deal with any claim fairly and in adherence with the terms and conditions of the contract agreed between us.

In many respects, a vessel is only as good as its owner. This is not just an observation about the owner's skill in operating the vessel but also how he

maintains her and supplies and crews her. There are also implications deriving from the character of the owner and any crew he may employ. From time to time, the question of what is a material fact? Is raised and the answer put simply is anything that might influence our perception of a risk is material. In considering the background of the insured, we are looking for patterns of behaviour that may affect how he operates his vessel or how he portrays that risk to us. Our application form asks specific questions about both vessel and operator to enable us to form a complete picture of the whole risk. These include enquiries as to past criminal convictions and driving records.

In terms of acceptability, we should never insure anyone with a conviction for any offence involving dishonesty as this would indicate that we could not put absolute trust in the representations that they make to us about other aspects of themselves or their vessel. We should also not consider offering insurance for anyone with drug or alcohol convictions including driving under the influence of alcohol unless there is an extenuating circumstance and a Director has agreed to our offering terms.

Anyone with multiple speeding convictions should be viewed with great scepticism as an acceptable risk unless the vessel to be insured is a very slow power vessel such as a trawler type or a sailing vessel. In general, if people drive a car recklessly, they will probably navigate a vessel in a similarly cavalier fashion.

If we have satisfied ourselves that the owner is an honest person with an acceptable driving record, then we must consider his competence level in respect not only of boats in general but the specific vessel to be insured. Generally, we will not insure people with no boating experience. People with low levels of experience (5 years or less) should only be considered in respect of smaller and easy to handle vessels that they have had for more than one year. Anyone with a low level of experience wishing to insure a larger vessel should only be considered if they will have the vessel operated by a suitably qualified skipper. If they are being trained by the skipper, we will accept them as operators once we have a letter signed by the skipper attesting to their competence.

When considering the competence of the owner for the vessel we must look at the types of vessel he has operated in the past. Ten years of operating a trawler with a top speed that barely exceeds ten knots is not of great assistance to a person upgrading to a high performance vessel that is capable of fifty knot speeds and is no attestation to his ability to successfully navigate a sailing vessel either. The two essentials to consider are the type of the vessel and the size of the vessel.

Assuming that the owner and operators (they may not be the same person) meet all of the standards referred to above we must consider their past loss records on boats as well as on the land. Again, we are seeking patterns and we specifically ask about marine losses – insured or not – to establish if any pattern of incidents exist that may not have been the subject of an insurance claim but that would suggest if we were to issue a policy could well become one against our underwriters. For example, an owner could have had a number of small grounding incidents that caused damage to his vessel but not enough to impact a policy. This would suggest that sooner or later if the pattern continues, he will commit a major navigational error that will result in an expensive insurance claim.

If an owner has had previous losses, these must be taken into consideration when deciding whether or not to offer terms and these will impact the price charged. In general, weather related losses are not indicative of poor practice on the part of the owner and should not be a bar to quotation, however, repeated storm losses may suggest a failure to take appropriate precautions against impending bad weather and should be treated accordingly.

As far as other past losses are concerned, as a rule, one is unfortunate; two begins to look like carelessness. More than that and the owner is probably not insurable. There may be extenuating circumstances but if you have doubts either refer to a Director or do not quote.

(iii)    Operational Acceptability

The last part of the question of overall acceptability is the 'where and the 'what' of the vessel's operation. For the most part, where is only an issue of weather related risk and aspects such as hurricane zones etc. are taken into account in the rating guide. You must however be satisfied that the vessel operator/crew are suitable for the voyage or operation being contemplated. For example, it is foolhardy for a single-engine power boat to undertake an extended crossing such as that between Florida and the Bahamas because if the engine fails at the mid point it will have no ability to control its movement and this is not a risk we would assume on behalf of our underwriters.

The size of a vessel is also very important when considering how far offshore it should be operated. A twenty foot powerboat probably would be incapable of carrying enough fuel to sail fifty miles offshore but we would not wish to offer that type of navigational limit in any event as it would be in danger from the potential sea conditions. Sailboats may not be so at risk from engine failure as a power boat but size must also be taken into account when offering navigational limits that could potentially allow extended voyages.

We are frequently asked to cover vessels that intend to undertake trans-oceanic voyages, if you are offered such a risk, you must assure yourself that the vessel is capable of the voyage proposed – usually only sailboats make these trips but there are some classes of powered vessels such as the Nordhaven trawler type that are also capable of doing this safely. If the vessel is acceptable, you must then be sure that it has adequate crew for the trip. As a rule, we insist on a minimum of three, experienced blue water sailors being on board. This means ideally sailors that have made similar trips before. Any deviation from this must be agreed by a Director involved in underwriting.

Charter risks involve additional risks to those of a privately operated vessel and we vary forms and rates accordingly to take these additional problems into account. Charter vessels fall into two categories, Captain Charter where a vessel is operated by the owner's paid captain (or the owner himself) and Bareboat Charter where the vessel is simply rented out to a third party for a specified period of time. Occasionally, we may see risks that are a blend of the two and these will attract the higher rates and more restricted terms associated with the greater risk of bareboat operations.

Captain Charter operations fall into many different categories, from a risk assessment perspective we must know the previous experience of the owner in such operations (it is unwise to insure a start up with no previous experience) and the qualifications of his crew if they are to operate the vessel. We also need to know something about his passengers, not only projected numbers, which affect not only premium but safety but also if he intends to charter to groups such as children's organisations or organisations for the disabled, either of

which significantly enhance the risk and which we would only consider in very specific circumstances subject to the approval of a Director involved in underwriting.

Bareboat Charter operations carry with them the additional burden of the unknown operator and we must have confidence in the precautions taken by the owner to ensure that only suitably experienced and qualified people charter his vessel in addition to the high standards of care and maintenance that we would normally expect of a vessel owner. It is also imperative that we are confident that the vessel will only be chartered to individuals on a recreational basis and will not be sub chartered to a commercial organisation that we would not have been able to assess as a risk.

There are certain areas of the world that are unsafe or that we are precluded from offering coverage within due to international sanctions or other governmental restrictions. These lists change from time to time but a referral to the Joint War Committee Listed Areas available at www.lmalloyds.com will generally bring you up to date on current difficult areas. In terms of listed or dangerous areas, we do allow transit subject to prior approval – this is frequently an issue with vessels transiting the Red Sea but we must be satisfied that the owner/operator has an intelligent plan for undertaking the voyage safely.


## 3. Renewing A Risk

We generally aim to issue terms on a risk that we wish to renew a minimum of 45 days prior to the expiry of a policy but not more than 60 days before. There is no legal requirement for us to do this but in some American States brokers are required to provide 45 days notice of an intent to renew or not, thus by doing this we assist brokers with whom we do business to comply with their local requirements. We do not offer terms more than 60 days prior to renewal to avoid having to revise or withdraw these in the event of claims or other developments between the terms being offered and the policy renewing.

It is the responsibility of the underwriting department to produce a daily list of all renewals falling due within the allotted time period. These will be allocated to individuals in the department to work on during the day. The database will provide a partially completed renewal form for each risk, based upon the original information provided when the current policy was written. This should form the basis for your renewal terms if you intend to offer them. Each risk must be reviewed according to the records maintained on the database, which will show you if there have been any claims and if there are any endorsements that change the risk in any way. If there have been claims, you should discuss these with the claims department to establish if there is anything that would indicate that the risk is not one that we should renew. Often, when a claim occurs, we obtain much more detailed information about owners, operators and vessels than we would normally see at the point of the original quotation. Sadly, it is sometimes the case that information comes to light as a result of claims investigations that shows that the original information submitted was inaccurate or occasionally just untruthful. As noted before, we depend upon the utmost good faith of the insured in providing the information we rely on to make judgments regarding the acceptability of the risk on offer. Any evidence of dishonesty on his part would generally disqualify him as a risk we would wish to assume on behalf of our underwriters.

In addition to reviewing any claims information you should also take into account any endorsements that have been made to the policy during its lifetime which may amend the risk. These should be replicated in the terms offered for the new policy or if they seem inapplicable, enquiry should be made of the insured's agent as to whether they are required or not.

## 4. Summary

In the introduction to this manual it was emphasised that CSR act as underwriting and claims managers to our underwriters with whom we have contracts to act on their behalf. In this role, we only do business with licensed, professional brokers who act on behalf of actual or prospective insureds. We are not parties to the individual policies of insurance that we issue on behalf of underwriters these are strictly contracts between the insured and the underwriters. The insured's agent may negotiate the terms required on behalf of his principal the insured and we may similarly amend terms requested on behalf of our principal the insurer. The insured's agent owes his loyalty and duty of care to the insured and we owe the same to the insurer. We take great care as a company to check the *bona fides* of each broker with whom we deal and in interacting with these individuals and companies you should treat them with courtesy and respect and remember that while they are not the actual customer, they bring him to us and they act in his name. You should also bear in mind however where the broker owes his loyalty and the pressures on him to obtain the best deal he is able for his client. The policies we issue are not contracts of adhesion in that the terms and conditions are negotiable, and while we wish to provide the best service possible to our customers, we must always do so with an eye to the protection of our underwriters.