IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION


CASE NO:  1:21 cv 24234 RKA ALTMAN

CLEAR SPRING PROPERTY AND

CASUALTY COMPANY,

          Plaintiff,

Vs.

WELLO AND MOM, LLC,



          Defendant.

_____

                    October 19, 2022

                    10:00 a.m. – 12:20 p.m.

                    VIA ZOOM


DEPOSITION OF

BERIC ANTHONY USHER


    Taken before MYRIAM BOSCH, Registered Professional
Reporter and Notary Public, in and for the State of
Florida, at Large, pursuant to a Notice of Taking
Deposition.

**2**

APPEARANCES:

CRISTINA SALEM, ESQUIRE
Martinez, Morales
2600 Douglas Road
Coral Gables, Florida  33134

JACQUELINE GOLDMAN, ESQUIRE
Goldman & Hellman
8751 W. Broward Blvd. - Ste. 404
Ft. Lauderdale, Florida  33324
Jacquie@goldmanandhellman.com

- - - - -

I N D E X

BERIC ANTHONY USHER

DIRECT EXAMINATION BY MS. SALEM           3
CROSS-EXAMINATION BY MS. GOLDMAN          65

DEFENDANT'S EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of Deposition | 9 |
| 2 | Policy | 39 |
| 3 | Renewal Questionnaire | 46 |
| 4 | Denial Letter | 52 |
| 5 | Clear Springs' Response to Request for Admissions | 55 |
| 6 | Answers to Interrogatories | 58 |
| 7 | Rule 26 Disclosures | 64 |

**3**

1 THEREUPON:
2            BERIC ANTHONY USHER
3 was called as a witness and after being duly sworn, was
4 examined and testified as follows:
5            DIRECT EXAMINATION
6 BY MS. SALEM:
7    Q.  Good morning, sir, my name is Cristina Salem.
8 I am one of the attorneys on the case for the defendant
9 Wello and Mom, LLC. Can you please state your name for
10 the record?
11    A.  Yes, my name is Beric, B-E-R-I-C, Anthony,
12 A-N-T-H-O-N-Y, Usher, U-S-H-E-R.
13    Q.  Have you been deposed before?
14    A.  Many times.
15    Q.  How many times would you say you had your
16 deposition taken?
17    A.  Two hundred, 300, I don't know.  Over the last
18 30 years, 300 I would think .
19    Q.  I am sure you are familiar with the whole
20 process of what is going to go down today?
21    A.  Yes, I am.
22    Q.  Have you ever testified at trial?
23    A.  Yes.
24    Q.  How many times have you testified at trial?
25    A.  Twenty.

**4**

1    Q.  In what types of cases did you testify at
2 trial?
3    A.  Otherwise as corporate witness for insurers on
4 marine cases. On one occasion I was a witness in a
5 criminal trial but I wasn't a party to the trial.
6    Q.  Have you ever testified as an expert witness?
7    A.  No.  Well, only expert underwriting.
8    Q.  As I am sure you are well aware what we are
9 going to do today is I am going to ask you a series of
10 questions regarding the insurance claim that we are here
11 to discuss. I ask that you please verbally answer every
12 question that I ask so that the Court Reporter can take
13 down everything we say today. As you know, she cannot
14 take down any hand gestures, nods or anything of that
15 sort. I ask that if you answer a question -- I'm sorry,
16 strike that.
17        If I ask you a question and you answer, I am
18 going to assume you understood the question so if you
19 don't understand any questions, please just let me know
20 and I will be happy to rephrase that for you; is that
21 okay?
22    A.  That's fine, Cristina.
23    Q.  If you need a break for any reason, please
24 just let me know and we can go ahead and take one. I
25 just ask that we answer any pending questions before we

**5**

1 go ahead on a break; is that fair?
2    A.  I understand.
3    Q.  Do you understand that you have an obligation
4 to say the truth here today?
5    A.  Yes.
6    Q.  Are you under the influence of any drugs or
7 medication that may inhibit your testimony today?
8    A.  No.
9    Q.  Do you have any medical condition that may
10 prevent you from giving an accurate testimony,
11 understanding my questions or recalling any events
12 today?
13    A.  No.
14    Q.  Your testimony today is on behalf of Clear
15 Springs Property and Casualty Company; is that right?
16    A.  That is correct.
17    Q.  Can you please tell me where you are currently
18 employed?
19    A.  I am currently employed at -- I am the
20 managing director of Concepts Special Risks Limited.
21    Q.  What kind of company is that?
22    A.  We are referred to as a managing general
23 agency.  That is to say that we perform the duties of an
24 underwriting office on behalf of principals, in this
25 case as the corporate representative for Clear Springs

2 (Pages 2 to 5)

6

1   Property and Casualty Company. Our functions involve the
2   assessment of businesses, underwriting of business, the
3   documentation of policies, the review of claims,
4   reporting statistics and assistance in the purchase of
5   any reinsurance.
6       Q.   How long have you worked at Concepts Special
7   Risk for?
8       A.   Effectively since 1999 but it was under
9   previous names, originally it was a company called T.L.
10  Dallas as in Texas, nothing to do with Texas.  It's just
11  a Scottish name.  Then we became a company called Osprey
12  Underwriting and became Osprey Special Risks in 2013.
13  We did a structural de-merger from Osprey Special Risks
14  and became Concepts Special Risks, but it's been the
15  same staff, the same operation and so on ever since
16  1999.
17      Q.   What is your current position with the
18  company?
19      A.   Managing director.
20      Q.   How long have you held that position for?
21      A.   Ever since 1999.
22      Q.   Do you supervise anybody as managing director?
23      A.   I supervise everybody as managing director but
24  when I say supervise, I am responsible for all the
25  activities of Concepts Special Risks acting as agent on

7

1   behalf of Osprey Property and Casualty and any other
2   insurers that we deal with as our principals.
3       Q.   Do you deal with any other insurers other than
4   Clear Springs Property?
5       A.   Yes, we underwrote for a company called Great
6   Lakes which is 100 percent owned subsidiary of Munich.
7   We underwrote on their behalf from 2003 to 2020.  We
8   currently also write for a company called Accelerant
9   Specialty Insurance Company and we also have Lloyd
10  Underwriters of Lloyd's of London.
11      Q.   Can you spell the Accelerant company, I don't
12  know if the Court Reporter got that?
13      A.   A-C-C-E-L-E-R-A-N-T Specialty Insurance.
14      Q.   Then do you currently have any other companies
15  that you work with or just the ones that you have named?
16      A.   Just the ones that I have named.
17      Q.   How many people do you supervise as managing
18  director?
19      A.   We have 22 staff in total.
20      Q.   What is your highest level of education?
21      A.   My highest level of education, advanced level
22  economics, accounts and art. I needed a break.
23      Q.   Art is a nice touch.  Where did you obtain
24  that degree from?
25      A.   It was called the (inaudible) St. Johns in

8

1   (inaudible) Grammar School for boys.
2       Q.   Do you currently hold any professional
3   licenses?
4       A.   No. What is called approved control by the
5   United Kingdom Financial Conduct Authority.
6       Q.   You said approved control?
7       A.   Control to be managing director of a regulated
8   company under the Financial Conduct Authority.
9       Q.   Do you have any licenses in the United States?
10      A.   No.
11      Q.   Have you ever had any complaints against the
12  license that you just mentioned?
13      A.   No.
14      Q.   Did you ever go through any training or
15  schooling in underwriting or evaluating damages for
16  both?
17      A.   No, not formal training, just 30 years
18  experience.
19      Q.   I am going to go ahead and share my screen
20  with you. Can you see the document that I have on the
21  screen here?
22      A.   Yes.
23      Q.   Do you recognize this document, sir?
24      A.   Yes, I do.
25      Q.   Can you please state what it is for the

9

1   record?
2       A.   It's a notice of deposition scheduled to take
3   place today at 10:00 a.m.
4       Q.   Are you here in response to this notice of
5   deposition today?
6       A.   Yes, I am.
7       Q.   Have you had a chance to review the documents
8   requested here and the areas of inquiry that are listed
9   in the notice of deposition?
10      A.   Yes, I have.
11      Q.   Did you bring any additional documents with
12  you today that were not already provided to our office
13  through your attorney?
14      A.   I have access to my full database and server
15  so I have all the electronic documents connected with
16  this file including everything that was provided to you
17  and also, of course, all the confidential information
18  between ourselves and counsel.
19      Q.   Are you the person with the most knowledge
20  concerning the areas of inquiry that are listed here?
21      A.   Yes, I am.
22      Q.   I am going to go ahead and mark this as
23  Exhibit No. 1, the notice of deposition.
24          (Defendant's Exhibit No. 1, Notice of
25          Deposition, was marked for identification.)

10

1  BY MS. SALEM:
2      Q.  Can you please tell me what you did to prepare
3  for this deposition today, and I am not referring to any
4  communication you may have had with your attorney?
5      A.  Yes, I reviewed the claims file and I reviewed
6  the underwriting files that were on our database.
7      Q.  What types of documents are in the claim file?
8      A.  All files, all correspondence between the
9  surveyor and adjuster, all the conversations internally
10 regarding the claim and obviously all the correspondence
11 between ourselves and counsel.
12     Q.  In the underwriting file can you briefly
13 explain what types of documents you have in there?
14     A.  Again, yes, all the correspondence between
15 ourselves and the producing broker, all the documents
16 provided to us by the producing broker on behalf of the
17 insured and, again, any e-mail traffic between us
18 internally between various departments in my company.
19     Q.  Did you have any conversations with anyone
20 other than your attorney concerning this case prior to
21 today's deposition?
22     A.  No.  Well, years ago perhaps, yes.  I mean, not
23 necessarily conversations.  We document everything by
24 e-mail so that we have a permanent record.
25     Q.  When you say years ago that you may have had

11

1  conversations concerning this case?
2      A.  Everything would be on e-mail, no actual voice
3  conversations.  So you have to note the file.  If we had
4  a conversation, we would have to note the file.  If we
5  exchange e-mails, it's already part of the file.
6      Q.  Did you have any discussions within your
7  company about today's deposition?
8      A.  No.
9      Q.  Have you communicated with anybody on your
10 team regarding today's deposition prior to today?
11     A.  No.
12     Q.  Who prepares the claim file and the
13 underwriting file that you were reviewing or have access
14 to today?
15     A.  Basically somebody within the claims
16 department.  There are now five.  The fifth one only
17 recently joined us so this file would be maintained by
18 either Mark Thomas who is my claims director, Sarah
19 Delancey Simms who is my claims manager, Samantha Thomas
20 who is a claims assistant or Lindsay Kopshop (phonetic)
21 I think who is a junior member staff that does a lot of
22 the file maintenance, but that would be literally place
23 the electronic files in the folder as opposed to
24 generating documentation herself.
25     Q.  Did you do anything else to prepare for

12

1  today's deposition other than what you just mentioned?
2      A.  No.
3      Q.  What was your involvement with the claim that
4  we are here to discuss today?
5      A.  Reviewing the file for the purposes of this
6  deposition and reviewing the file for -- reviewing the
7  underwriting files for the purpose of this deposition.
8  Up until that appointment the claim had been handled by
9  my claims department.
10     Q.  Who was handling the claim in your claims
11 department?
12     A.  The lead claim handler was Sarah Delancey
13 Simms.
14     Q.  Do you know what Ms. Simms' qualifications
15 are?
16     A.  Yes, she's got a -- she's a qualified lawyer
17 and she got a first in law and then a master's in law
18 and then she works also as an -- also has additional
19 qualification for legal executive.
20     Q.  Is she the person who made a decision
21 regarding the claim?
22     A.  As to whether the claim should be denied?
23     Q.  Yes, a coverage decision.
24     A.  The coverage decision was made by Clear
25 Springs. Let me elaborate by giving you the procedure

13

1  that we adopt.
2          When a claim is reported to us, we will then
3  appoint an adjuster to investigate the claim. Depending
4  on the outcome of the investigation if there are issues
5  of coverage, we will go to Clear Springs and suggest
6  that they seek a legal opinion. They then tell us if
7  they wish to seek a legal opinion and if they do, we
8  then go to counsel to seek a legal opinion.
9          Once we receive that, we go back to Clear
10 Springs, give them the legal opinion and ask if they
11 wish to deny which in this case they did. At that point
12 we issued a denial letter and in this case I believe we
13 also issued a declaratory action.
14     Q.  Can you tell me who was the adjuster assigned
15 to this claim?
16     A.  Yes, a company called Sedgwick.
17     Q.  On what date was the claim assigned to
18 Sedgwick?
19     A.  On the 28th of September, 2021.
20     Q.  Do you know who at Sedgwick was handling the
21 claim?
22     A.  Yes, a gentleman.  Revel Boulon, R-E-V-E-L,
23 B-O-U-L-O-N.
24     Q.  Do you know what his qualifications are?
25     A.  Not off the top of my head but he is extremely

4 (Pages 10 to 13)

14

1  highly qualified.
2      Q.  Is he an adjuster or an engineer or do you
3  know?  Do you have any idea what his qualifications are
4  or what he does?
5      A.  All of the above, yes, he is a licensed and
6  qualified adjuster. He is a licensed and qualified
7  surveyor. He is a licensed and qualified engineer. He is
8  also a U.S. Coast Guard approved something or other.
9          MS. GOLDMAN:  He is also very good looking,
10     not that that is relevant.
11  BY MS. SALEM:
12     Q.  Seems like someone you want to have as your
13  friend because of his qualifications?
14     A.  All I can say, relatively short name, Revel
15  Boulon and he has a lot more letters after his name than
16  he has in it.
17     Q.  Good for him. What was his involvement as
18  adjuster on -- for the claim?
19     A.  What he would have done is appointed a field
20  surveyor. I think in this instance it was a gentleman
21  called Michael Grant who visited the vessel to inspect
22  it. Michael Grant then provides his field survey to
23  Revel Boulon. Revel will then go through the surveyor's
24  findings, ask any questions that he feels are
25  appropriate, if he thinks that there is anything that is

15

1  not being clear within the field survey, and then make
2  his determination and report to us.
3      Q.  On what date did Mr. Michael Grant inspect the
4  vessel?
5      A.  Let's see. It would be on the -- the report
6  that I have reveals that the vessel was surveyed at
7  Marathon boatyard but it doesn't actually tell me the
8  date in this report.  It doesn't tell me the date the
9  inspection took place.
10     Q.  Do you know if anybody else on behalf of Clear
11  Springs inspected the property?
12     A.  I don't believe so. I think it was just the
13  field surveyor.
14     Q.  Did the field surveyor create a report of his
15  findings after his inspection?
16     A.  He would have reported to Revel Boulon and
17  Sedgwick.
18     Q.  But did he create an actual document or report
19  with notes or describe what he inspected.
20     A.  Most certainly but you would have to secure
21  that from Mr. Bounol.  We don't have it in the file.
22     Q.  So that is not something that is included in
23  your claim file; is that correct?
24     A.  That is correct.
25     Q.  Did he take any photographs as part of his

16

1  field survey?
2      A.  Yes, he did and actually that might tell me
3  when those photographs were taken. Let's see.
4          Yes, he did take a number of photographs but
5  it doesn't tell me when. There is numbers in the bottom
6  line corner but I can't read them.  I don't know when
7  these photographs were actually taken.
8      Q.  And how many pictures did he take as part of
9  his field survey?
10         MS. GOLDMAN:  Objection.
11     A.  I don't know. I can only tell you the number
12  of photographs that were sent to us.
13     Q.  How many is that that you have in your file?
14     A.  Fourteen.
15     Q.  Once the field surveyor provided this
16  information to Revel, did Revel create a report or some
17  sort of an opinion of his findings?
18     A.  Yes, he did.  His report was dated the 22nd of
19  November.
20     Q.  2021?
21     A.  2021, yes.
22     Q.  Did Mr. Revel ever visit or inspect the
23  vessel?
24     A.  No.  He would have relied on the field
25  surveyor, I believe.

17

1      Q.  Then so going back to the order of how you
2  stated things occur once Mr. Revel gave his opinion is
3  it correct that at that point it was recommended to
4  Clear Springs to get a legal opinion?
5      A.  Yes.  We would have visited Clear Springs and
6  said that there were several issues that were raised in
7  the investigation and the report and that we invited
8  them to see and ask them if they wished us to seek a
9  legal opinion.
10     Q.  I think I missed a step.  So when Revel gets
11  the report from the surveyor and he analyzes it and does
12  his finding, does Sedgwick then give the report to your
13  office and then you provide it to Clear Springs or how
14  does that work?
15     A.  Could you repeat the question?  I was just
16  looking at Revel's notes.
17     Q.  My question was once the field surveyor
18  provides the information to Sedgwick, does Sedgwick then
19  give the report to your company and then you give it to
20  Clear Springs or does it go directly to Clear Springs?
21     A.  No, it comes via us.
22     Q.  Do you issue any opinions at that point or you
23  just give it to Clear Springs and then ask if they want
24  to get a legal opinion?
25     A.  What we will do at that stage is we will

5 (Pages 14 to 17)

18

1    attach a copy to the report and highlight the issues
2    that we consider have been raised as a result of the
3    report. Then Clear Springs' decision is as to whether or
4    not they wish to seek legal opinion which, in this case
5    they did and we sought that legal opinion.
6         Q.  What issues did you bring to Clear Springs'
7    attention based on Revel's report?
8         A.  Well, we sent the full report and really
9    didn't require much in the way of additional comment
10   from us because the report contained the relevant issues
11   at that time. So the report highlighted the exclusions
12   that would have -- that there would be no coverage for
13   this claim were all detailed in the report. We just look
14   to see if we put any additional rhetoric.
15        All we said is, "Please see the attached
16   report for this matter. As you can see, there are
17   several issues to coverage. So, as such, we believe it
18   appropriate to seek the advice of Goldman & Hellman.  We
19   look forward to hearing from you," and they came back
20   and said, yes, go seek an opinion.
21        Q.  Understood. Earlier you mentioned Sarah Simms.
22   Is she who the legal opinion was given by?
23        A.  No, no, no. We don't give legal opinion. Both
24   my senior claims people are qualified lawyers, they are
25   not United States lawyers.  They are English lawyers,

19

1    the laws of England and Wales. As a consequence they
2    would not be qualified to tender a legal opinion on a
3    matter that is the subject of federal admiralty.
4         Q.  Aside from the field surveyor and the field
5    adjuster did anybody else have any involvement with this
6    claim?
7         A.  Not that I am aware of. I mean, other than
8    within our office but if you are talking about on the
9    site inspecting the vessel or discussing issues with
10   Mr. Cisneros, no, I am not aware of anybody else.
11        Q.  You mentioned that you have -- that you had I
12   believe a lead representative on the file. Was there
13   somebody else working on the file?
14        A.  Oh, yes. I mean, there would be other people.
15   Again, our procedure is that because of the volume of
16   business that we transact what we would do invariably is
17   we would put a lead person on who is going to lead the
18   handling of the claim. In this case it was Sarah
19   Delancey Simms. However, all claims documents are also
20   copied to Mark Thomas who is our claims director.
21        So if Mark Thomas, for example, sees an issue
22   or has a query, then he will discuss it and he can
23   intervene if he chooses to or he can contact Sarah and
24   ask if she's looked into this particular issue.
25   Likewise, it's also copied to Samantha Thomas who is

20

1    there for file maintenance and so on along with her
2    assistance.
3         Q.  Understood. Can you please tell me the alleged
4    date of loss for the claim?
5         A.  Yes, it was September 27, 2021.
6         Q.  What was reported for the claim?
7         A.  That Mr. Cisneros was on vacation in Marathon
8    and noticed something on his CCTV, that the vessel was
9    partially submerged.
10        Q.  Can you repeat that?
11        A.  Yes, the insured, Mr. Cisneros, had noticed
12   something on his CCTV that the boat was partially sunk
13   or partially submerged.
14        Q.  Who reported the claim to Clear Springs?
15        A.  The claim was reported to us by an agency,
16   insurance agency called Wilson, Washburn & Forster
17   Insurance, Inc.
18        Q.  Was it reported by telephone or e-mail or any
19   other method?
20        A.  It was reported by e-mail the 27th of
21   September, 2021 at 1729 hours, so 5:29 in the evening
22   local time in Florida which would have been therefore
23   10:29 at night in the UK time which is why the adjuster
24   wasn't appointed until the 28th, the following morning.
25        Q.  Do you have in your file the time that was

21

1    reported that the boat was sinking or partially
2    submerged?
3         A.  I believe it was 3 o'clock in the morning if I
4    remember where in the file I got that but I seem to
5    recall it was about 3 o'clock in the morning.
6         Q.  Was this vessel inspected at any point prior
7    to the inception of this policy period?
8         A.  You mean was it surveyed?
9         Q.  Or surveyed?
10        A.  Yes, there was a survey in 2019, I believe it
11   was July.
12        Q.  Sorry, I wasn't sure if you were looking for
13   the date or if that is your answer.
14        A.  I will look for the date.  I have gone to a
15   separate section. It will take a little while because I
16   have now run into the database away from the server.
17        Q.  No problem, I can wait.
18        A.  Yes.  It was surveyed by Mr. Ariel Cabrera on
19   the 29th of July, 2019.
20        Q.  Does Mr. Cabrera work for a company?
21        A.  He is an independent surveyor.
22        Q.  Is that somebody that was sent by Clear
23   Springs or that was hired or retained by the insured?
24        A.  By the insured.
25        Q.  Does the survey reveal a condition of the boat

6  (Pages 18 to 21)

22

1  in July 2019?
2      MS. GOLDMAN:  Could you repeat that?  I didn't
3  catch the question.
4  BY MS. SALEM:
5      Q.  Does the survey state or specify the condition
6  of the vessel in July of 2019?
7      A.  Yes, they use an expression of above average.
8      Q.  On what date was the first policy issued by
9  Clear Springs for this vessel and what was the policy
10  period for the first policy?
11      A.  It was July 31, 2021, to July 31, 2022, both
12  days inclusive.
13      Q.  So the first date that Clear Springs ever
14  provided coverage for the policy was July 31, 2021; is
15  that correct?
16      A.  That is correct.
17      Q.  So for the year or for prior to July 31, 2021,
18  does your file indicate what company was providing
19  coverage for the vessel?
20      A.  Yes, it was Great Lakes Insurance.
21      Q.  Was the file transferred to Clear Springs or
22  did the insured reach out to get another company, do you
23  know?
24      A.  Effectively, yes.  Great Lakes elected not to
25  continue writing the boat business primarily because of

23

1  hurricane losses, I think, and our contract with them
2  expired on December 31, 2020.  We negotiated a contract
3  with Clear Springs whereby we would then underwrite on
4  their behalf instead of Great Lakes.
5      So once this is new business to Clear Springs,
6  it's existing business to Concept Special Risks because
7  we had written it previously on behalf of Great Lakes.
8      Q.  So for this specific vessel that we are
9  discussing today it was an existing file for Concept
10  Special Risks; is that correct?
11      A.  That is correct.
12      Q.  What were the dates, if you have in your file,
13  for the policy coverage before July 31, 2021?
14      A.  July 31, 2020, to July 31, 2021.
15      Q.  Is that the only other policy that was written
16  by Great Lakes Insurance or that was in Concepts Special
17  Risks file?
18      A.  No, we also underwrote the previous year which
19  was July 31, 2019, to July 31, 2020, and I believe the
20  year prior to that we wrote the policy from July 31,
21  2018, to July 31, 2019.  Prior to that we had written a
22  policy from July 26, 2016, to July 26, 2017, the policy
23  was non-renewed for the 2017, '18-year period.
24      Q.  Was that by the choice of the insured or for
25  another reason within the company?

24

1      A.  No.  It was an active nonrenewal by the
2  insurer.  The vessel had suffered a loss in 2016 which
3  turned out to be corrosion of the fuel tank caused
4  presumably by standing water rotting the container
5  around the fuel tank.  So it was elected at that stage to
6  not renew the policy for the 2017-2018 period.
7      Q.  Was a claim filed for that loss in 2016?
8      A.  Yes.
9      Q.  Was coverage provided for that claim?
10      A.  No, coverage was denied because the loss arose
11  from wear, tear and gradual deterioration as opposed to
12  a fortuity or external event.
13      Q.  Do you have any record indication that the
14  insureds, I guess, fixed what was at issue or what was
15  damaged from the 2016 loss?
16      A.  Well, it's not mentioned on the 2019 survey so
17  one could only draw the conclusion that he had repaired
18  it, the damage.
19      Q.  Then prior to entering into the July 26, 2016,
20  policy to -- sorry, no.
21      So the loss occurred in 2016 and there is a
22  nonrenewal for 2017 so prior to entering into the
23  July 31, 2018, policy was a survey required by the
24  insurer?
25      A.  Yes, when we quoted the risk on July 26, 27,

25

1  2018, we required a survey to be provided.
2      Q.  Was a survey provided at that time?
3      A.  Yes, there was a survey conducted by Mr. Ned
4  Hickel, H-I-C-K-E-L on July 15, 2016.
5      Q.  That survey was used to issue a policy for the
6  2018 to 2019 period; is that correct?
7      A.  Yes, a new survey was required for the
8  2019-2020.
9      Q.  After the 2020 policy period was another
10  survey requested prior to entering into the 2020 to 2021
11  period?
12      A.  No, because the 2019 survey would have just
13  been in date (phonetic).  They were scheduled to get a
14  new survey on -- I believe in July 2021.
15      Q.  Did they get a survey in July of 2021?
16      A.  I don't believe so.  I think it would have
17  taken place just as the survey was due but let me
18  double-check.
19      Note, next survey was due on July 31, 2022.
20      Q.  When a survey is provided, does it last or can
21  they use it for a certain amount of time prior to when
22  another one is required or due?
23      A.  Yes, normally surveys are good for two to
24  three years.  If the vessel has been held, then it's
25  good for three years.  If it's an in-water survey, it's

26

1  only good for two years.
2      Q.  Prior to the issuance of the 2021 policy, was
3  the insured required to submit any document or
4  applications to the insurance company?
5      A.  Yes. When we originally wrote it in 2018
6  because it had been a gap in coverage and we are not
7  linked this far to a file that we have previously
8  written, we would have required a full application form.
9  For subsequent years then we require a questionnaire
10 which is a short form application form which highlights
11 any differences that have occurred during the preceding
12 12-month period so we don't ask for a complete
13 application form for each renewal period.
14     Q.  Was a renewal questionnaire requested prior to
15 the 2021 policy period?
16     A.  Yes.
17     Q.  Was one received by Clear Springs?
18     A.  Yes.
19     Q.  Does somebody review the renewal questionnaire
20 and thereafter followup with the application?
21     A.  Yes.
22     Q.  Do you know the name of the individual who
23 reviewed the renewal questionnaire?
24     A.  Yes, it was Kim Hatcher.
25     Q.  What company does she work with?

27

1      A.  She's one of my employees.
2      Q.  Did Ms. Hatcher note any issues with the
3  renewal questionnaire?
4      A.  No.
5      Q.  If there were issues with the renewal
6  questionnaire presumably the policy would not have been
7  issued; is that correct?
8      A.  That is correct.
9      Q.  So on September 27, 2021, the policy was
10 effective; is that correct?
11     A.  That is correct.
12     Q.  So before -- I have some more questions.
13 Before I get into them I would like to take a quick
14 break if it's okay with everyone.  We can come back at
15 11:00 a.m.
16         (Recess taken.)
17 BY MS. SALEM:
18     Q.  I believe the last question I asked was
19 regarding the policy effective dates and you say that
20 policy was effective on September 27, 2021; is that
21 correct?
22     A.  Let me just double check. The policy was
23 July 31, 2021.
24     Q.  So that means that on July 27, 2021, the
25 policy was in effect; is that correct?

28

1      A.  The previous policy, the 2021-22 policy
2  incepted on July 31, 2021. You're mentioning July 27th
3  being September 27.
4      Q.  I said September 27th of 2021 and if I did, I
5  apologize.  That is the date I am referring to.
6      A.  Fine, yes, so it was in effect at the
7  September 27, 2021, yes.
8      Q.  Can you please tell me the policy number that
9  was in effect on September 27, 2021?
10     A.  Yes.  It was CSRYP/204845.
11     Q.  Just to be clear this policy was a renewal; is
12 that correct?
13     A.  No, this is new business to Clear Springs. It
14 was an existing policy to Concept Special Risks
15 previously placed with Great Lakes.
16     Q.  Because the business was just being
17 transferred within the Concept Company, is that why the
18 renewal questionnaire was requested?
19     A.  That is correct.
20     Q.  We previously discussed that Ms. Kim Hatcher
21 is the one who reviewed the renewal questionnaire and
22 she did not note any issues with the questionnaire upon
23 receipt; is that correct?
24     A.  Correct, the only outstanding issue was the
25 hurricane plan that was yet to be received so once that

29

1  was received, the policy was issued.
2      Q.  Can you tell me every reason why the claim was
3  denied?
4      A.  Yes.  We sent a denial letter to the insured
5  on the 3rd of December, 2021. Our denial was based on
6  the fact that the investigation following the loss
7  indicated that the partial sinking the vessel suffered
8  on September 27th was not an accident and physical loss.
9  There was no fortuity. It was just the vessel sank.
10        Second, the investigation indicated that the
11 partial sinking of the vessel suffered on September 27th
12 was not caused by an external, an accidental or external
13 event. So, therefore, there was no coverage under the
14 policy.
15        Thirdly, the investigation established the
16 partial sinking of the vessel suffered on
17 September 27th, was caused by wear, tear and gradual
18 deteriorations and/or lack of maintenance. Fourthly, the
19 investigation indicated that the inception -- at
20 inception of the policy and at the time of the partial
21 sinking, the vessel was unseaworthy.
22        Fifth, the investigation at the time, the
23 investigation revealed that at the time he, Mr.
24 Cisneros, submitted the renewal questionnaire in
25 July 21st he did not truthfully disclose that the vessel

8 (Pages 26 to 29)

30

```
1   suffered a loss in 2016.
2       Finally, the investigation following loss
3   indicates that the fire extinguishers and the fire
4   suppression system on board the vessel had been serviced
5   and tagged in March 2019 and that the certification and
6   tags on the vessel's fire extinguishers and fire
7   suppression systems had been expired since March 2020.
8   Therefore, the policy is void for inception and affords
9   no coverage for the loss.  Those are grounds for denial.
10      Q.  So the first one, what facts is Clear Springs
11  relying on to support its contention that the sinking
12  was not an accidental physical loss?
13      A.  The report from Sedgwick.
14      Q.  Does that report contain any findings to show
15  what was the cause of loss?
16      A.  It's speculated that there may well have been
17  an internal ingestion of water inasmuch as, let's see
18  what he says in his report.
19      Yes, the vessel was fitted with two automatic
20  bilge pumps fore and aft. Upon checking up rising both
21  pumps failed to operate in automatic mode and only one
22  operated in manual mode.  After the bilge pump automatic
23  flow switch was inoperable and the fourth bilge pump and
24  automatic flow switch were both inoperable, there were
25  multiple tide marks in the bilge wells and machinery
```

31

```
1   space indicating periods of prolonged stagnant bilge
2   water accumulation and conditions prior to the loss.
3       The vessel was launched during the survey and
4   there was no source of steep water ingress occurring.
5   There were, however, clogged dead drains allowing for
6   water ingress through the cockpit/deck hatch receiver
7   when subjected to a simple water hose test that was
8   conducted in the cockpit.
9       The conclusion as to the cause of the loss was
10  long term water accumulation in the vessel's bilge tank
11  wells from rain, seawater and wash downs resulting in
12  the vessel sitting low in the water until it submerged
13  to the point where unfettered water ingress began
14  occurring and accelerated to the point of the final
15  loss.
16      That was the summation of Revel
17  Boulon/Sedgwick, following the field survey, conducted
18  by, I believe, Michael Grant.
19      Q.  Is it possible that water accumulation was not
20  long term but that it was a one-time instance?
21      MS. GOLDMAN:  Objection.
22      A.  The special surveyor inspecting it saw tide
23  marks. Tide marks are created because of water settling
24  and sitting for quite long periods of time. If it was a
25  single event, there wouldn't be tide marks.
```

32

```
1   BY MS. SALEM:
2       Q.  Does your file indicate where the boat was
3   kept by the insured?
4       A.  The insured was on vacation at the time this
5   incident occurred in Marathon. Let's go to the hurricane
6   plan to tell you where the vessel was normally stored.
7       I believe at the insured's house. The vessel
8   was normally stored in Hallandale Beach, which was the
9   insured's address.
10      Q.  Was it stored on land or in the water?
11      A.  In the water.
12      Q.  Does the report indicate where the tide marks
13  were observed by the field surveyor?
14      MS. GOLDMAN:  Objection.
15      A.  The field surveyor provided photographs.  You
16  recall I mentioned 14 photographs?
17  BY MS. SALEM:
18      Q.  Yes.
19      A.  I believe it is contained within those
20  photographs.
21      Q.  Were the tide marks on the, I guess, external
22  portion of the boat on the outside?
23      A.  Inside.
24      Q.  Inside?
25      A.  Inside in the bilge area.
```

33

```
1       Q.  Other than the reasons you just stated from
2   the report are there any other facts that Crystal
3   Springs is relying on to indicate that the loss was not
4   an accidental physical loss?
5       MS. GOLDMAN:  Objection.
6       A.  No, I believe we are relying upon the report
7   prepared and provided by Sedgwick.
8   BY MS. SALEM:
9       Q.  The second basis for the denial you stated was
10  that the vessel suffered -- the sinking was not caused
11  by an accidental external event. What facts is Clear
12  Springs relying on to evidence that it was not caused by
13  an accidental external event?
14      A.  Simply there is no evidence of striking a
15  submerged object, there was no impact damage, no
16  reported other incident. This vessel just gradually took
17  on water and sank.
18      Q.  For the third denial basis you said it was
19  caused by wear and tear, gradual deterioration and/or
20  lack of maintenance. Can you please tell me what facts
21  or evidence Clear Springs is relying on for this basis
22  for denial?
23      A.  Yes, the bilge pumps were not functioning. The
24  battery showed heavy corrosion indicating that they were
25  being charged when submerged which also gives you the
```

9 (Pages 30 to 33)

34

1 information about the standing water in the vessel.
2    Had the vessel been properly maintained then
3 the bilge pumps would be functioning, the battery would
4 not have corrosion, there would not be tide marks in the
5 bilge pump areas or in the bilges and, of course, the
6 fire extinguishers would be properly tagged and
7 certified.
8    Q.  Were all of these things that you mentioned
9 investigated or checked prior to the inception of this
10 policy period by Clear Springs?
11    A.  No.
12    Q.  Why is that?
13    A.  Because we, yes, require the insured to have
14 the vessel surveyed.  We don't survey vessels ourselves
15 unless there is an insurance incident.  Then we go and
16 inspect the vessel but we do not do pre-underwriting
17 inspection surveys ourselves.
18    Q.  Do you require any maintenance reports or
19 records from the insured prior to the inception of the
20 policy period or during the policy period?
21    A.  No.  We require the insured to comply with all
22 recommendations and comply with warranties within the
23 policy.
24    Q.  Are there recommendations specific to an
25 insured or are they just general within the policy?

35

1    A.  No, recommendations are normally provided by
2 the surveyor who inspects the vessel prior to it --
3 prior to the insurance contract attaching.
4    Q.  Do you know if the 2019 surveyor had any
5 recommendations for this insured?
6    A.  I believe there was only one.
7    Q.  What was that?
8    A.  Something about CO2 detectors.
9    Q.  Did the 2019 survey contain any
10 recommendations concerning the items you previously
11 listed regarding the fire extinguisher and I didn't get
12 them all written down what you just read from your list.
13    A.  As far as the fire extinguishers were
14 concerned, they had been checked in March 2019, they
15 would have been current when the survey was conducted in
16 July 2019, so there was nothing about fire extinguishers
17 because they were in date.
18    Q.  You also mentioned a list of other items that
19 Clear Springs claims suffered wear and tear, gradual
20 deteriorations or lack of maintenance.  Did any of those
21 things come up with the 2019 survey?
22    MS. GOLDMAN:  Objection.
23    A.  Not anything as regard to tide marks,
24 inoperable bilge pumps or corroded battery connections
25 as in 2019 because that was two years before the

36

1 incident.
2 BY MS. SALEM:
3    Q.  Then the fourth basis for denial you stated
4 was that the vessel was unseaworthy. Can you please
5 expand on how a vessel is unseaworthy or what that
6 means?
7    MS. GOLDMAN:  Objection.
8    A.  Yes, pretty simply basically vessels are
9 intended to float. In order for a vessel to be seaworthy
10 it must at least be able to float.  It must also have
11 competent crew. It must have accurate charts. It must
12 have various other aspects that go to the seaworthiness
13 of the vessel but, above all, it's got to be able to
14 float. So when you are confined with the report loss
15 where the vessel sank in calm weather with no storm and
16 no external reason for it to sink, there is a
17 presumption that the vessel simply sank.
18    Q.  Does that mean that it is Clear Springs'
19 position that the vessel became unseaworthy on
20 September 27, 2021, or was it unseaworthy as of a
21 different date?
22    A.  It must have been unseaworthy prior to that
23 date because you can't develop tide marks during the
24 course of a day. That would be over a course of six
25 months, 12 months, 18 months. We have no idea how long

37

1 but it must have been a condition that was in existence
2 for a relatively prolonged period of time.
3    Q.  Does your file or any of the reports that you
4 have indicate the dates that the vessel became
5 unseaworthy?
6    A.  No, we can't say that with any certainty.  All
7 we can do is say that it was unseaworthy at the time of
8 the incident. As I said, the tide marks suggest that it
9 had been unseaworthy for a period of time but we can't
10 speculate as to how long that would have been.
11    Q.  If a vessel is unseaworthy what happens to the
12 policy?
13    A.  It's voided.  If you look at the policy
14 language, there is always an implied provision of
15 seaworthiness in any marine policy. Nobody can insure if
16 a vessel is unseaworthy but we also have an express
17 clause regarding seaworthiness within the policy
18 language that the vessel must remain seaworthy
19 throughout the period of the policy.
20    Q.  So does the policy that we are here to discuss
21 today contain the expressed clause of seaworthiness in
22 it?
23    A.  Yes.
24    Q.  Can you tell me where in the policy that is
25 stated?

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

38

1   A.  Yes, it's in general conditions nine which is
2  on Page 12 of the policy. It's the second warranty down,
3  warranty B.
4       "It is warranted that the scheduled vessel is
5       seaworthy at all times during the duration of this
6       insuring agreement.  Breach of this warranty will
7       void this insurance agreement from its inception."
8   Q.  I am going to share my screen with you.  Can
9  you see what I have here on the screen?
10   A.  Yes.
11   Q.  Let me scroll up so can you see the first page
12  of the document I am showing.  Is this the policy that
13  we have been discussing today?
14   A.  That is correct.
15   Q.  You were just reading you said from Page 12?
16   A.  Yes.
17   Q.  Is that here what I have on the screen,
18  general conditions nine?
19   A.  Second paragraph.
20   Q.  Other than this provision of the policy, is
21  the seaworthiness described or explained in any other
22  portion of the policy?
23   A.  Yes, there is a definition of seaworthiness
24  under definitions on the first page, I believe, which is
25  on page 1, paragraph K.  Page 1 of the policy language.

39

1   Q.  Page 3, you said K?
2   A.  Look at K and for the benefit of the reporter,
3  seaworthy means fit for the vessel's intended purpose.
4  Seaworthiness applies not only to the physical condition
5  of the hull but to all its parts, equipment and gear and
6  includes the responsibility of finding an adequate crew
7  for the scheduled vessel to be seaworthy and its crew
8  must be reasonable proper and reasonable and suitable
9  for its intended purpose -- sorry, its intended use.
10   Q.  For the record, let's go ahead and mark the
11  policy as Exhibit No. 2, please?
12       (Defendant's Exhibit No. 2, Policy, was marked
13       for identification.)
14  BY MS. SALEM:
15   Q.  If you go to the policy since this is the
16  first time we look at it together today, is this
17  document that is here the accurate policy for the period
18  that we have been discussing?
19   A.  That is correct.
20   Q.  What is the coverage limit for the vessel
21  pursuant to this policy?
22   A.  The hull it is $230,871.
23   Q.  I am going to stop sharing my screen now. So
24  the next basis for denial you stated was so the insured
25  did not truthfully disclose that your vessel suffered a

40

1  loss in 2016, so I guess that was based on the renewal
2  questionnaire that was submitted in July 2021; is that
3  correct?
4   A.  Well, it's based on the initial application
5  form that was submitted in 2018 I believe because we had
6  written this policy in 2016, the vessel had suffered a
7  loss but we had denied because it was not a fortuity, it
8  was just corrosion.
9       Again, gradual wear and tear and deterioration
10  and we, therefore, non-renewed the policy so there was a
11  gap in coverage. The risk was then represented to us as
12  new business in 2018 with a full application form. The
13  application form asks a number of questions. Two of the
14  questions are, one, have you been involved in a loss in
15  the last ten years, insured or not, to which the insured
16  had responded no.
17       Have you ever been non-renewed, cancelled or
18  non-renewed by an insurance carrier, answer, no. In both
19  instances those answers were inaccurate. It had both
20  suffered a loss and had been non-renewed.
21   Q.  After submission or receipt of the full
22  application form in 2018, was coverage afforded for the
23  vessel or provided?
24   A.  Yes.
25   Q.  At that time, did the insurance company know

41

1  of the loss that occurred in 2016?
2   A.  If the search had been conducted more
3  forensically we would have located the previous loss and
4  we would not have written this policy but we had not
5  connected the two. Purely and simply because our
6  database is enormous and we run surf programs to see if
7  we have previously written the policy. We had previously
8  written the policy and it's as simple as the company was
9  Wello ampersand Mom, LLC. When it was presented to us
10  again it was presented as Roy and Anna Linda Cisneros
11  and the corporate name of Wello and, A-N-D, Mom, LLC.
12  Unfortunately, because the database contains literally
13  hundreds and hundreds and hundreds of thousands of
14  records, it goes on a very precise search process so if
15  you put in Wello and Mom, it's not going to come up
16  because what would come up would be Wello ampersand Mom,
17  LLC, so we did not connect the two policies.
18       So once we were -- the information regarding
19  the 2016 incident was available to us, we hadn't
20  connected it to their file which was presented as new
21  business by a different broker.
22   Q.  So in 2018, was a search -- aside from 2018
23  generally is a search only done through the name of the
24  insured or potential insured that is submitting the
25  application form or do you also search by the vessel or

11 (Pages 38 to 41)

42

1 any other identification number?
2   A.  No. We search basically by the name of the
3 insured. Had we searched we possibly could have searched
4 on the name of the vessel LoLette which would have come
5 up but, again, what you're looking at is -- I don't know
6 what the quote number of this was in 2019. Let's see.
7 That was already quoted a number, 390530, Version E.
8 When you consider this was also a policy number 169671
9 in 2018 it gives some indication as to the size of the
10 database. So even with a very strong system it can take
11 a long time if you do multiple searches; it can take an
12 awful long time to try and forensically find if you have
13 ever seen anything.
14       So underwriting departments heavily rely on
15 the application form being presented to them.
16   Q.  Does the underwriting department only conduct
17 a more detailed forensic investigation on certain
18 instances or is it once or after the policy is already
19 written or never at all?
20   A.  No, normally speaking they will do a search,
21 the underwriters have a responsibility to do a search on
22 the system first of all to see if we have brokered it to
23 somebody else because we quote approximately a hundred
24 to 130 risks a day so as a consequence you are
25 frequently going to get a situation whereby you have

43

1 received the same risk from two different brokers so we
2 do a search for that purpose and we also -- it also
3 provides an issue as to whether you have previously
4 written the policy.
5       If you have written the policy, that
6 information in that file will be germane to accepting
7 the new policy. In this instance, the underwriter did
8 their search but it didn't come up.
9   Q.  Is there some sort of database where you can
10 search for prior claims for the vessel?
11   A.  It's contained within the -- only to the
12 extent of, we have recorded it in our database. There is
13 no way you can establish -- we don't have a central
14 claims database that records all claims, the records,
15 all policies, part of which says whether the vessel has
16 had a claim or not.
17   Q.  The 2016 claim would have been something that
18 was included in your database; is that correct?
19   A.  Yes, it would have been in the database.  We
20 connected the two policies.
21   Q.  I am going to share my screen again, so is
22 this the renewal questionnaire that was submitted for
23 the 2021 to 2022 policy period?
24   A.  Yes, I believe so, yes.
25   Q.  Who fills out the information in this

44

1 document?
2   A.  We partially complete it where it says,
3 "Expiring coverage, currently quoted coverage." That is
4 completed by our data base.
5   Q.  This portion, and is it also up here, is this
6 top portion written in or included once it is provided
7 to the insured?
8   A.  That is correct.
9   Q.  So the quote number here was issued by Concept
10 Special Risks?
11   A.  Yes.
12   Q.  Then here where it says, "Scheduled vessel,"
13 What is this XSK number?
14   A.  That is the hull identification number.
15   Q.  Is this hull identification number something
16 that you can also search in your database when
17 underwriting the policy?
18   A.  We could.
19   Q.  Is it something that the underwriting
20 department typically does?
21   A.  No.  You will see now already in July 2021 you
22 now quote number 449,320 and you're on policy number
23 183,480. That will give you a concept of the style that
24 we are talking about for searching for information.
25   Q.  This means that you are one businessman, I

45

1 guess?
2   A.  Yes.
3   Q.  Does this hull identification number ever
4 change from the time a person purchases a vessel?
5   A.  I don't believe so, no.  It's unique to that
6 vessel.
7   Q.  Going down what information does the insured
8 input, like they circle I guess the yes or no
9 questionnaire?
10   A.  That is correct.
11   Q.  Here on Page 2, do they input any information
12 here?
13   A.  We provide the information that we had on file
14 so we told the insured that his next survey was due on
15 July 31, 2022, and it should be performed out of water.
16 We are highlighting for him that is when his next survey
17 is due so he can plan it. We also put about the existing
18 navigation.  Often if they require different
19 navigational limits, then please detail below and attach
20 an itinerary.  We then go on so what we are doing here
21 is we are showing him the information that we currently
22 have on file and we are asking him are there any
23 changes.
24   Q.  If there were a change, for example, to I
25 guess here where the vessel is located, would they have

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

46

1  to write it in here in the bottom portion?
2      A.  Yes.
3      Q.  If they don't write anything here it's assumed
4  that none of the information has changed, right?
5      A.  That is correct.
6      Q.  Then going down to Page 3, this information
7  handwritten was done by the insured; is that correct?
8      A.  That is correct.
9      Q.  Who prepares this document prior to it being
10  submitted to the insured, who put all this information
11  from the system into this document?
12      A.  We do. It's from the database.
13      Q.  Does somebody actually physically type it in
14  or it just auto-generated?
15      A.  Auto-generated in the main.
16      Q.  If we can go ahead and mark this as Exhibit
17  No. 3, the renewal questionnaire.
18          (Defendant's Exhibit No. 3, Renewal
19      Questionnaire, was marked for identification.)
20  BY MS. SALEM:
21      Q.  Does it ask in this questionnaire anything
22  regarding fire extinguishers or maintenance of the boat
23  or anything of that sort?
24      A.  No.
25      Q.  One of the bases for the denial that you

47

1  stated was that you submitted the renewal questionnaire
2  on July 2021, you did not truthfully disclose that your
3  vessel suffered a loss in 2016.
4          So is it Clear Springs' position that anything
5  other than the loss information was misrepresented in
6  this questionnaire?
7      A.  I don't believe so other than the non-
8  renewal. This relates back to the original application
9  form that was provided in 2018.
10      Q.  But after the original application form was
11  provided in 2018, the policy was renewed for a couple of
12  periods before this renewal questionnaire that we are
13  looking at was submitted; is that correct?
14      A.  That is correct.
15      Q.  Each time the policy is renewed does the
16  underwriting department conduct a new search for the
17  insureds?
18      A.  No, because we are assuming that everything
19  has been picked up in the previous year's policy.
20      Q.  When the 2018 original application was
21  submitted was it picked up that there was a loss in 2016
22  from the database?
23      A.  No.
24      Q.  I am going to stop sharing my screen again. I
25  believe the sixth and final reason that you stated why

48

1  Crystal Springs denied the claim was because the
2  investigation following the loss indicates that the fire
3  extinguishers and the fire suppression systems on board
4  had last been certified intact and tagged in 2019; is
5  that correct?
6      A.  That is correct.
7      Q.  Did Clear Springs conduct any research to
8  determine whether the fire extinguishers and fire
9  suppression systems were renewed at any time after March
10  of 2020?
11      A.  I don't think I understand the question.
12  Could you repeat the question, see if I can unravel it?
13      Q.  Did Clear Springs conduct any investigation to
14  determine whether or not the fire extinguishers and the
15  fire suppression systems were renewed after their
16  expiration in March of 2020?
17      A.  No, we do no pre-inspections as regard
18  underwriting. It's just a warranty in the policy
19  language.
20      Q.  Is there a way to search whether the vessel
21  had been issued a new fire extinguisher or fire
22  suppression system after the one for 2019 expired?
23      A.  No, there is no way we would do that.
24      Q.  So the only way to get that information would
25  be by looking on board; is that correct?

49

1      A.  That is correct.
2      Q.  Does your file indicate that any other fire
3  extinguisher or fire suppression system was issued to
4  the vessel after March of 2020?
5      A.  No, on the contrary, it says that the tags on
6  the fire suppression equipment and the fire
7  extinguishers expired and had not been checked and
8  tagged and certified since that date.
9      Q.  Does the policy include language concerning
10  fire extinguishers and fire suppression systems?
11      A.  Yes.
12      Q.  What provision of the policy discusses that?
13      A.  It is on Page 13 under general conditions
14  nine, paragraph K, it states, "If the scheduled vessel
15  is fitted with fire extinguishing equipment, then it is
16  warranted that such equipment is properly installed and
17  is maintained in good working order. This includes the
18  tags once a year -- once a year certification/ tagging
19  and recharging as necessary."
20      Q.  So if the fire extinguisher expired in March
21  of 2020, would Clear Springs have required information
22  concerning the renewal prior to issuing the new policy
23  for 2021?
24      A.  We would assume that the insured complied with
25  the policy conditions and warranties. Had we been made

13 (Pages 46 to 49)

50

1 aware, for example, had Mr. Cisneros come to us and
2 said, "I haven't gotten around to certifying my fire
3 extinguishing equipment, could you still provide me with
4 the coverage," then the answer would be no, it would not
5 be an issue of additional premium or higher deductible.
6 It's simply a warranty.
7     Q.  I am going to share my screen again with you.
8 Do you see what I have here on the screen?
9     A.  Yes, this is a denial letter.
10     Q.  Is this the denial letter that you mentioned
11 earlier during your deposition?
12     A.  That is correct.
13     Q.  Can you please state the date of this letter
14 for the record?
15     A.  December 3, 2021.
16     Q.  Who was this letter drafted by?
17     A.  It was signed by Sarah Delancey Simms.  I am
18 not sure if it was originally drafted by counsel.
19     Q.  When you say "counsel," do you mean Sarah
20 Simms or somebody else?
21     A.  I mean counsel here, Goldman & Hellman.
22     Q.  These are the items that we discuss here on
23 the bottom for Clear Springs' basis for denial.  Other
24 than these six issues that we have discussed throughout
25 this deposition is there any other basis for the denial

51

1 that Clear Springs is relying on today?
2     A.  Only the issue of the non-renewal which I
3 don't believe we have pleaded but whether it's
4 worthwhile seeking amendment to incorporate that I think
5 it's unlikely that we will do that so these would be the
6 only grounds.
7     Q.  What do you mean the non-renewal?  What do you
8 mean by that statement?
9     A.  In the application form you recall a question
10 is asked has your policy ever been cancelled or non-
11 renewed and to which Mr. Cisneros responded no when, in
12 fact, it had been cancelled -- it had been non-renewed
13 by Great Lakes at the end of the 2016-year policy so
14 there is another misrepresentation there. The question
15 mark is whether given the amount of causes whether it
16 would be worthwhile to seek leave to amend the complaint
17 to incorporate the misrepresentation with regard to the
18 non-renewal.
19     Q.  Just to be clear, I know that we discussed
20 this at the beginning of the deposition but the coverage
21 determination was that -- the final answer to deny the
22 claim, was that something that was decided by Clear
23 Springs?
24     A.  Yes, effectively Clear Springs agreed that we
25 should seek a legal opinion.  We obtained a legal

52

1 opinion, gave it to Clear Springs and Clear Springs
2 decided to, based upon the legal opinion, that they
3 should proceed to deny the claim.
4     Q.  So this letter dated December 3, 2021, was
5 issued after Clear Springs obtained the legal opinion;
6 is that correct?
7     A.  That is correct.
8     Q.  I believe you testified, I want to be clear,
9 the legal opinion was given to you by Ms. Goldman's law
10 firm; is that correct?
11     A.  That is correct.
12     Q.  Does Clear Springs typically solely use this
13 law firm to obtain its legal opinions?
14     A.  No.
15     Q.  Does it use various other law firms for other
16 claims and issues?
17     A.  Yes, we use other law firms for the same issue
18 and other issues.
19     Q.  If we can go ahead and mark the denial letter
20 as Exhibit 4.
21         (Defendant's Exhibit No. 4, Denial Letter, was
22     marked for identification.)
23 BY MS. SALEM:
24     Q.  Do you recognize the document that I have here
25 on my screen?

53

1     A.  Yes.
2     Q.  Can you please identify it for the record?
3     A.  Yes.  These were my responses to your
4 Interrogatories, I guess.
5     Q.  The document I have here says, "First requests
6 for admission"?
7     A.  Yes, that is where I am reading, scroll down a
8 little.
9         Yes.
10     Q.  So did you have a chance to review these
11 questions prior to today's deposition?
12     A.  Yes, but I don't remember them, I don't have a
13 photographic memory but I do recall seeing them, yes.
14     Q.  I just want to bring your attention to a
15 couple of these specific questions.
16         So the fourth request for admission states,
17 "Admit that on or about September 27, 2021, the boat was
18 severely damaged due to a partial sinking."
19         The response there is, "Admitted that the
20 vessel was damaged as a result of a partial sinking on
21 September 27, 2021."
22         Do you see that?
23     A.  Yes, I do.
24     Q.  Clear Springs has no disputes that the vessel
25 partially sank on the date of loss; is that right?

14 (Pages 50 to 53)

54

1    A.  That is correct.
2    Q.  So is it true that the only dispute between
3  the parties I guess the cause -- not the only dispute
4  but the main disputes or one of the disputes is the
5  cause of the partial sinking?
6    A.  That is correct.
7    Q.  But Clear Springs does admit or recognize that
8  on September 27, 2021, the vessel was sinking?
9    A.  That is correct.
10    Q.  The fifth request for admissions speaks about
11  the timing of reporting the claim. Was the claim timely
12  reported by Wello and Mom?
13    A.  Yes, it was timely.
14    Q.  Then the next question I guess asks about
15  Concept Special Risks. So Clear Springs did not retain
16  them to investigate the claim. They were the managing
17  general agent for Clear Springs?
18    A.  That is correct. We appoint subcontractors
19  specialists to investigate the claim.
20    Q.  In this case it was Sedgwick as we discussed;
21  is that right?
22    A.  That is correct.
23    Q.  Then at all times the premium owed for the
24  policy was paid by Wello; is that right?
25    A.  That is correct.

55

1    Q.  However, the claim was denied for the vessel
2  as we have discussed here today, correct?
3    A.  That is correct.
4    Q.  Then going down to No. 11 it says, "Admit that
5  you did not inspect the boat prior to renewing the
6  policy," and that was admitted.
7        We discussed today that Clear Springs does not
8  typically inspect boats prior to renewing policies or at
9  their inception but they require surveys; is that right?
10    A.  That is correct.
11    Q.  Prior to the inception of this policy period
12  there was a survey that was provided that covered this
13  time; is that right?
14    A.  Correct.
15        Can I just ask you to hold for two to three
16  minutes? There is one particular job I am the only
17  person that can do and I have to do it now.
18        (Recess taken.)
19  BY MS. SALEM:
20    Q.  I actually don't have any other questions on
21  the request for admissions so if we can just go ahead
22  and mark them as Exhibit No. 5, Clear Springs' response
23  to request for admissions.
24        (Defendant's Exhibit No. 5, Clear Springs'
25        Response to Request for Admissions, was marked for

56

1  identification.)
2  BY MS. SALEM:
3    Q.  Now I would like to show you the Interrogatory
4  answers. Let me just pull them up here.
5        Do you recognize this document that I have
6  here on the screen?
7    A.  Yes.
8    Q.  Did you answer these questions on behalf of
9  Clear Springs?
10    A.  Yes.
11    Q.  The people that are listed here, is this the
12  Revel that we were previously discussing today?
13    A.  Yes.
14    Q.  We also discussed others that are not listed
15  here. So for the third interrogatory question it asks
16  for a basis for denying and for the reasons for the
17  denial and these are all things that we have discussed,
18  these are things that we have discussed here today;
19  however, we didn't -- I mean, you mentioned the word
20  fortuitous events but can you just explain how the
21  damage was not caused by a fortuitous event for this
22  claim?
23        MS. GOLDMAN:  Objection.
24    A.  Yes, effectively because the vessel just sank
25  in calm water and there was no evidence of impact

57

1  damage, storm damage, lightning strike or an actual
2  event that occurred, so essentially what we are saying
3  is there was no fortuity, it was an inevitability.
4  Ultimately that vessel was going to sink regardless of
5  whether or not there was an external event that caused
6  the vessel to sink so that is effectively what we are
7  saying, there was no actual event that caused the
8  sinking. It was just a gradual sinking into water.
9    Q.  Then going down to the sixth question, so it
10  discusses investigations conducted prior to renewing the
11  policy. So in the answer it says that you rely on the
12  veracity of the insured's representation to Clear
13  Springs. This is something that is common in the
14  industry?
15    A.  Yes.
16    Q.  So it's common for, I guess, other maritime
17  insurance companies to not conduct investigations prior
18  to issuing policies or renewing policies?
19    A.  Yes, as far as I am aware most insurers rely
20  entirely on the application form and the completeness
21  and truthfulness of the information contained therein.
22    Q.  Is a subsequent investigation concerning, I
23  guess, answers from an application or renewal
24  questionnaire ever conducted when issuing policies?
25    A.  Sorry, repeat the question, please, Cristina.

15  (Pages 54 to 57)

58

1      Q.   When Clear Springs gets an application or if
2  they get a renewal questionnaire and they get the
3  answers from the potential insured, do they do any
4  investigations when they get the answers to the
5  applications after that?
6      A.   No.  We rely entirely on the application form
7  and the information provided.
8      Q.   So there is never any subsequent
9  investigations that are done once the application and
10 renewal questionnaires are received?
11     A.   That is correct.
12     Q.   That is pretty much it for this document, so
13 if we can go ahead and mark this as Exhibit No. 6,
14 Answers to the Interrogatories.
15         (Defendant's Exhibit No. 6, Answers to
16         Interrogatories, were marked for identification.)
17 BY MS. SALEM:
18     Q.   Let me just bring this, so does the policy
19 contain a duties after loss section?
20     A.   Yes, it has duties in the event of a loss.
21     Q.   Is that list contained within the policy or is
22 it a separate document that is given to the insured?
23     A.   That is contained in the policy and also
24 provided as an additional document.
25     Q.   Was that document provided to Wello and Mom at

59

1  inception of this policy period?
2      A.   Yes, at inception of the policy and also at
3  the time when the incident was reported.
4      Q.   Did Wello and Mom comply with the list of
5  items that are in the duties in the event of loss
6  section of the policy?
7      A.   As far as I am aware, yes.
8      Q.   Can you tell me where in the policy this
9  section is located?
10     A.   Yes, it's on Page 15, it starts on the --
11 under Section 10 headed, "Your duties in the event of a
12 loss."
13     Q.   Then there is 14 items that are listed there;
14 is that correct?
15     A.   Yes.
16     Q.   It's your testimony today that Clear Springs
17 complied with the applicable provisions here, the 14
18 subsections under this section of the policy, right?
19     A.   Yes, I believe so.  There is also subsequently
20 also issued with the policy a claims guidance document
21 that is provided as additional assistance and refers to
22 the policy, tells them what the process is, how we go
23 through the decisionmaking and so on.
24     Q.   When was that provided to Wello and Mom?
25     A.   That is provided at the time of the quotation

60

1  and then again at the time the policy is issued.
2      Q.   The last item I would like to share with you,
3  do you recognize this document that I have here on the
4  screen?
5      A.   Yes, I believe so.
6      Q.   So on this document it lists individuals
7  likely -- well, or, sorry, can you please identify this
8  document for the record?
9      A.   Yes, Rule 26 disclosures.
10     Q.   So this is Clear Springs' Rule 26 disclosures
11 and on this document it lists individuals likely to have
12 discoverable information. So here it has some
13 individuals that we have not discussed today, for
14 example, No. 2, Liam Gilhooly.
15         It says here that he has information
16 concerning the knowledge of application submitted.
17         Which application does he have knowledge
18 about?
19     A.   I believe he has knowledge about the 2018-year
20 but he has no more knowledge than I have.
21     Q.   What is his position at Concept Special Risks?
22     A.   He is my deputy assistant underwriter, so it's
23 underwriting manager.
24     Q.   Did he have any, I guess, knowledge or did he
25 do anything regarding the renewals and specifically the

61

1  2021 policy renewal?
2      A.   No, the only people that were involved there
3  were Tony Barker (phonetic) and Kim Hatcher.
4      Q.   That was going to be my next question, who
5  Tony Barker was.
6      A.   Tony Parker is another underwriter that is
7  junior to Liam Gilhooly.
8      Q.   Do Tony Barker and Kim Hatcher only work on
9  renewal applications?
10     A.   No, they work on new business and renewals.
11     Q.   But they were the only two involved with the
12 2021 policy renewal; is that correct?
13     A.   That is correct.
14     Q.   Then we discussed Ms. Sarah Delancey Simms.
15 Can you tell me who Ms. Samantha Thomas is?
16     A.   A claims assistant that works with Sarah
17 Delancey Simms.
18     Q.   So she also has knowledge just of the claim
19 and the investigation, I guess, report that was provided
20 to Concept Special Risks; is that correct?
21     A.   Yes, primarily she would be doing for
22 maintenance rather than being involved in any
23 correspondence or conversation or anything connected
24 with the claim itself.
25     Q.   Then who is Mr. Justin Ouimet, O-U-I-M-E-T?

16  (Pages 58 to 61)

62

1    A.   Probably French origin somewhere, I never met
2  the gentleman but he works with the broker that we work
3  with.
4    Q.   What is his involvement with the claim?
5    A.   He was the broker acting for Mr. Cisneros, in
6  fact, actually acting for the retail broker that was --
7  I have got the name here somewhere. Mr. Cisneros and
8  Wello and Mom dealt with a local insurance agent called
9  Williams, Washburn & Forster Insurance of Northwest 13th
10  Avenue, Miami, Florida.  We were unfamiliar with those
11  people. They, in turn, brokered the business through
12  Casey Insurance Management. That was a broker we did
13  deal with.
14    Q.   Who was the producing broker for this policy?
15    A.   Casey Insurance Group.
16    Q.   Going down, Ariel Cabrera, what year did he do
17  the survey for?
18    A.   I believe he did the 2016. No, hold on a
19  minute. He did the 2019 survey.
20    Q.   When did Wello and Mom purchase the vessel, do
21  you know?
22    A.   Yes, on the 27th of June, 2016.
23    Q.   Mr. Cabrera did the survey in 2019, you said?
24    A.   That is correct.
25    Q.   So because here in No. 9, it says, "The

63

1  witness is believed to have knowledge of the condition
2  of the vessel at the time of purchase."
3       Is that true?
4    A.   I think they have got it the wrong way around.
5  I think Mr. Hickel was the person who did the survey in
6  2016.
7    Q.   Then Cabrera did it in 2019?
8    A.   Correct.
9    Q.   The loss that we discussed before, did it
10  occur -- I know it was in 2016, can you tell me the date
11  that the loss occurred in 2016 again?
12    A.   Yes, I think it was September 6, 2016.
13    Q.   That was the date for the loss that we
14  previously discussed regarding -- I think it was the
15  fuel tank?
16    A.   That is correct.
17    Q.   Then Revel, we discussed him a lot.
18       Is it true that Clear Springs has not retained
19  an individual or company to compute the damages
20  sustained to the vessel from the date of loss that is
21  alleged in the claim?
22    A.   We received a full report which the report
23  showed the extent of damage and the likely cost of
24  repair.
25    Q.   Who created that report?

64

1    A.   Revel Boulon of Sedgwick.
2    Q.   What was the amount of damages that were
3  computed in that report?
4    A.   I think it was a constructive total loss. That
5  is to say the repair cost would exceed the value of the
6  vessel.
7    Q.   Would that mean that full policy limits would
8  be provided if it's not an exclusion under the policy?
9    A.   That is correct.
10    Q.   That value on the policy was around 230,000
11  that we looked at earlier today; is that right?
12    A.   That is correct.
13    Q.   If we can go ahead and mark this as Exhibit
14  No. 7, we will call it Rule 26 disclosures.
15       (Defendant's Exhibit No. 7, Rule 26
16       Disclosures, were marked for identification.)
17       MS. SALEM:  That concludes my questions, I do
18  not have any further questions at this time.  We
19  would like to reserve the right to conduct the
20  deposition on a date, a later time if we need, I
21  don't believe that will be necessary but I just
22  like to reserve right on the record.
23       MS. GOLDMAN:  You can say it on the record all
24  you want.  I am not sure under what circumstances
25  that would be possible.

65

1       If you have any more questions, this is your
2  time.
3       MS. SALEM:  Not at this time, no thank you.
4            CROSS-EXAMINATION
5  BY MS. GOLDMAN:
6    Q.   Mr. Usher, I have just a few questions, please
7  give me a moment while I pull up the 2018 underwriting
8  file.
9       I am going to share the screen.  Can you see
10  what I have just shared on the screen?
11    A.   Yes.
12    Q.   It's a 142-page document that I will represent
13  to you was produced by Clear Springs as the 2018
14  underwriting file?
15    A.   That is correct.
16    Q.   Just a moment. Earlier we had discussed, or
17  earlier while Ms. Salem was questioning you, you
18  mentioned the new 2018 application.  Do you recall
19  discussing that?
20    A.   Yes.
21    Q.   Again, it was new because there had been a
22  non-renewal at the end of the 2016 policy; is that
23  correct?
24    A.   That is correct.
25    Q.   Let the record show I am on Page 2 of the

17 (Pages 62 to 65)

66

1 underwriting file for the 2018 policy. Is this the 2018
2 application that you are referring to?
3     A.   This was the original application form
4 presented to us for quotation by Casey Insurance Group.
5     Q.   That is from Page 2 to Page 3, correct?
6     A.   That is correct.
7     Q.   Then on Page 63 of the underwriting file for
8 the 2018 policy can you tell me what this document is?
9     A.   This is the quotation that we submitted or
10 that we sent to Casey Insurance Group on July 30th so
11 that, I believe, was the second quote.  You see the
12 quote number is 190530B. The first quote would have been
13 390530A.
14     Q.   On the bottom of the page it says, "Insuring
15 agreement wording as per SYP/8/PPO." Do you see that?
16     A.   Yes.
17     Q.   Can you tell me what that means?
18     A.   That is the coding for the standard yacht
19 policy version eight, private pleasure only.  It would
20 also have been attached to the quotation.
21     Q.   As far as you know that quotation when it was
22 sent to the insured's agent would have included the
23 proposed policy language as well?
24     A.   That is correct.
25     Q.   On Page 65 of the underwriting file for the

67

1 2018 policy, can you tell me what this document is?
2     A.   This is, you will notice on the quotation, all
3 quotations are subject to a fully completed and signed
4 Concept Special Risks Limited application form and this
5 is their Concept Special Risks application form.
6     Q.   Is this what you were discussing earlier when
7 you said that the new policy -- pardon me, when the new
8 application, the name of the insured was Wello ampersand
9 Mom, LLC?
10     A.   That is correct.
11     Q.   What would the effect have been had the
12 insured truthfully disclosed the 2016 loss and the
13 resulted non-renewal?
14        MS. SALEM: Objection to form.
15 BY MS. GOLDMAN:
16     Q.   -- in 2018.
17        MS. SALEM: Objection to form.
18     A.   It probably would have prompted us to do a
19 greater research to establish what the cause of the
20 non-renewal was.  If the non-renewal was caused by the
21 loss, which we now know of course it was, then we would
22 not have written the policy especially since we were the
23 people who had non-renewed the policy.
24 BY MS. GOLDMAN:
25     Q.   If, let's say, there had not been a

68

1 non-renewal but just a prior loss under the same
2 circumstances in 2016 but with a different insurer, what
3 would the results have been had that been disclosed?
4        MS. SALEM: Objection to form.
5     A.   Again, if it was just a traditional claim that
6 had gone through the normal process of approval and
7 payment, then we simply would have charged a higher
8 premium.
9 BY MS. GOLDMAN:
10     Q.   Could you say by approximately how much?
11     A.   Probably between ten and 15 percent, depends
12 on, you know, if the loss that we described was --
13 because if the loss had been properly described that it
14 was an initial corrosion that would have brought red
15 flags. However, if it had been the same amount but
16 caused by something else, for example, it had been a
17 lightning strike or a collision or a strike with a
18 submerged object or whatever, then it would just be an
19 additional premium and it would have probably been
20 around ten to 15 percent, so $675.
21     Q.   Can you tell me what this is on Page 76 of the
22 2018 underwriting file?
23     A.   Yes, that is the policy language.
24     Q.   The proposed policy language that would have
25 been sent with the quote, correct?

69

1     A.   The quote and then subsequently with the
2 policy.
3     Q.   On Page 73 of the 2018 policy, can you tell me
4 what this is?
5     A.   Something provided by Casey Insurance Group to
6 the insured. It says it's a new policy. Customer
7 information, I think it's probably to do with the
8 payment of the premium that he is paying by MasterCard
9 it looks like. I can't see, it's not really clear but
10 this is a document that is not provided by us and didn't
11 need to be provided to us either. This looks like it's
12 to do with the authorization to bind the policy and bind
13 coverage.
14        MS. GOLDMAN:  That is all that I have for
15 you, Mr. Usher.
16        You have right to read the transcript of your
17 deposition for any errors.
18        Do you with you to read or waive?
19        THE WITNESS:  Myriam is doing such a good job,
20 I will waive.
21        MS. GOLDMAN: I want to order it.
22        (The reading and signing of the deposition was
23 waived and the deposition was concluded at 12:20
24 p.m.)
25

18 (Pages 66 to 69)

70

```
 1            CERTIFICATE OF OATH
 2
 3
 4  STATE OF FLORIDA    )
 5  COUNTY OF DADE      )
 6
 7  I, Myriam Bosch, the undersigned authority, hereby
 8  certify that the following-named deponent personally
 9  appeared before me and was thereupon duly sworn:
10            BERIC ANTHONY USHER
11  WITNESS my hand and official seal this 28th day of
12  October, 2022.
13
14
15            Myriam Bosch
16        Myriam Bosch
          Notary Public - State of Florida
17        Commission No. GG 941432
          My commission expires 3/27/24
18
19
20
21
22
23
24
25
```

71

```
 1            CERTIFICATE
 2  STATE OF FLORIDA )
              SS.
 3  COUNTY OF DADE   )
 4
 5      I, MYRIAM BOSCH, Registered Professional Reporter
 6  and Notary Public, in and for the State of Florida at
 7  Large, do hereby certify that I reported in shorthand,
 8  the Deposition of BERIC ANTHONY USHER, that the witness
 9  was first duly sworn by me, that the reading and signing
10  were waived and that the foregoing pages, numbered from
11  1 to 71, inclusive, constitute a true and correct
12  transcript of my shorthand notes.
13      I further certify that I am not of counsel, I am
14  not employed by nor related to an attorney to this
15  suit, and I am not financially interested in the outcome
16  thereof.
17      Dated at Miami, Dade County, Florida, this 28th day
18  of October, 2022.
19
20
21          Myriam Bosch
22
23  My Commission expires:
24  3/27/2024
25
```



Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

**A**

**A-C-C-E-L-E-...**
7:13
**A-N-D** 41:11
**A-N-T-H-O-N-...**
3:12
**a.m** 1:16 9:3
27:15
**able** 36:10,13
**Accelerant** 7:8
7:11
**accelerated**
31:14
**accepting** 43:6
**access** 9:14
11:13
**accident** 29:8
**accidental** 29:12
30:12 33:4,11
33:13
**accounts** 7:22
**accumulation**
31:2,10,19
**accurate** 5:10
36:11 39:17
**acting** 6:25 62:5
62:6
**action** 13:13
**active** 24:1
**activities** 6:25
**actual** 11:2
15:18 57:1,7
**additional** 9:11
12:18 18:9,14
50:5 58:24
59:21 68:19
**address** 32:9
**adequate** 39:6
**adjuster** 10:9
13:3,14 14:2,6
14:18 19:5
20:23
**admiralty** 19:3
**admission** 53:6
53:16
**admissions** 2:22

54:10 55:21,23
55:25
**admit** 53:17
54:7 55:4
**admitted** 53:19
55:6
**adopt** 13:1
**advanced** 7:21
**advice** 18:18
**afforded** 40:22
**affords** 30:8
**aft** 30:20
**agency** 5:23
20:15,16
**agent** 6:25 54:17
62:8 66:22
**ago** 10:22,25
**agreed** 51:24
**agreement** 38:6
38:7 66:15
**ahead** 4:24 5:1
8:19 9:22
39:10 46:16
52:19 55:21
58:13 64:13
**alleged** 20:3
63:21
**allowing** 31:5
**ALTMAN** 1:5
**amend** 51:16
**amendment**
51:4
**amount** 25:21
51:15 64:2
68:15
**ampersand** 41:9
41:16 67:8
**analyzes** 17:11
**and/or** 29:18
33:19
**Anna** 41:10
**answer** 4:11,15
4:17,25 21:13
40:18 50:4
51:21 56:8
57:11
**answers** 2:23

40:19 56:4
57:23 58:3,4
58:14,15
**Anthony** 1:20
2:15 3:2,11
70:10 71:8
**anybody** 6:22
11:9 15:10
19:5,10
**apologize** 28:5
**APPEARANC...**
2:1
**appeared** 70:9
**applicable** 59:17
**application** 26:8
26:10,13,20
40:4,12,13,22
41:25 42:15
47:8,10,20
51:9 57:20,23
58:1,6,9 60:16
60:17 65:18
66:2,3 67:4,5,8
**applications**
26:4 58:5 61:9
**applies** 39:4
**appoint** 13:3
54:18
**appointed** 14:19
20:24
**appointment**
12:8
**appropriate**
14:25 18:18
**approval** 68:6
**approved** 8:4,6
14:8
**approximately**
42:23 68:10
**area** 32:25
**areas** 9:8,20
34:5
**Ariel** 21:18
62:16
**arose** 24:10
**art** 7:22,23
**aside** 19:4 41:22

**asked** 27:18
51:10
**asking** 45:22
**asks** 40:13 54:14
56:15
**aspects** 36:12
**assessment** 6:2
**assigned** 13:14
13:17
**assistance** 6:4
20:2 59:21
**assistant** 11:20
60:22 61:16
**assume** 4:18
49:24
**assumed** 46:3
**assuming** 47:18
**attach** 18:1
45:19
**attached** 18:15
66:20
**attaching** 35:3
**attention** 18:7
53:14
**attorney** 9:13
10:4,20 71:14
**attorneys** 3:8
**authority** 8:5,8
70:7
**authorization**
69:12
**auto-generated**
46:14,15
**automatic** 30:19
30:21,22,24
**available** 41:19
**Avenue** 62:10
**average** 22:7
**aware** 4:8 19:7
19:10 50:1
57:19 59:7
**awful** 42:12

**B**

**B** 38:3
**B-E-R-I-C** 3:11
**B-O-U-L-O-N**

13:23
**back** 13:9 17:1
18:19 27:14
47:8
**Barker** 61:3,5,8
**base** 44:4
**based** 18:7 29:5
40:1,4 52:2
**bases** 46:25
**basically** 11:15
36:8 42:2
**basis** 33:9,18,21
36:3 39:24
50:23,25 56:16
**battery** 33:24
34:3 35:24
**Beach** 32:8
**began** 31:13
**beginning** 51:20
**behalf** 5:14,24
7:1,7 10:16
15:10 23:4,7
56:8
**believe** 13:12
15:12 16:25
18:17 19:12
21:3,10 23:19
25:14,16 27:18
31:18 32:7,19
33:6 35:6
38:24 40:5
43:24 45:5
47:7,25 51:3
52:8 59:19
60:5,19 62:18
64:21 66:11
**believed** 63:1
**benefit** 39:2
**Beric** 1:20 2:15
3:2,11 70:10
71:8
**bilge** 30:20,22
30:23,25 31:1
31:10 32:25
33:23 34:3,5
35:24
**bilges** 34:5

**bind** 69:12,12
**Blvd** 2:10
**board** 30:4 48:3
  48:25
**boat** 20:12 21:1
  21:25 22:25
  32:2,22 46:22
  53:17 55:5
**boats** 55:8
**boatyard** 15:7
**Bosch** 1:22 70:7
  70:16 71:5
**bottom** 16:5
  46:1 50:23
  66:14
**Boulon** 13:22
  14:15,23 15:16
  64:1
**Boulon/Sedgw...**
  31:17
**Bounol** 15:21
**boys** 8:1
**Breach** 38:6
**break** 4:23 5:1
  7:22 27:14
**briefly** 10:12
**bring** 9:11 18:6
  53:14 58:18
**broker** 10:15,16
  41:21 62:2,5,6
  62:12,14
**brokered** 42:22
  62:11
**brokers** 43:1
**brought** 68:14
**Broward** 2:10
**business** 6:2
  19:16 22:25
  23:5,6 28:13
  28:16 40:12
  41:21 61:10
  62:11
**businesses** 6:2
**businessman**
  44:25

――――――――
        **C**
――――――――

**Cabrera** 21:18
  21:20 62:16,23
  63:7
**call** 64:14
**called** 3:3 6:9,11
  7:5,8,25 8:4
  13:16 14:21
  20:16 62:8
**calm** 36:15
  56:25
**cancelled** 40:17
  51:10,12
**carrier** 40:18
**case** 1:5 3:8 5:25
  10:20 11:1
  13:11,12 18:4
  19:18 54:20
**cases** 4:1,4
**Casey** 62:12,15
  66:4,10 69:5
**Casualty** 1:7
  5:15 6:1 7:1
**catch** 22:3
**cause** 30:15 31:9
  54:3,5 67:19
**caused** 24:3
  29:12,17 33:10
  33:12,19 56:21
  57:5,7 67:20
  68:16
**causes** 51:15
**CCTV** 20:8,12
**central** 43:13
**certain** 25:21
  42:17
**certainly** 15:20
**certainty** 37:6
**CERTIFICATE**
  70:1 71:1
**certification**
  30:5
**certification/**
  49:18
**certified** 34:7
  48:4 49:8
**certify** 70:8 71:7
  71:13

**certifying** 50:2
**chance** 9:7 53:10
**change** 45:4,24
**changed** 46:4
**changes** 45:23
**charged** 33:25
  68:7
**charts** 36:11
**check** 27:22
**checked** 34:9
  35:14 49:7
**checking** 30:20
**choice** 23:24
**chooses** 19:23
**circle** 45:8
**circumstances**
  64:24 68:2
**Cisneros** 19:10
  20:7,11 29:24
  41:10 50:1
  51:11 62:5,7
**claim** 4:10 10:7
  10:10 11:12
  12:3,8,10,12
  12:21,22 13:2
  13:3,15,17,21
  14:18 15:23
  18:13 19:6,18
  20:4,6,14,15
  24:7,9 29:2
  43:16,17 48:1
  51:22 52:3
  54:11,11,16,19
  55:1 56:22
  61:18,24 62:4
  63:21 68:5
**claims** 6:3 10:5
  11:15,18,19,20
  12:9,10 18:24
  19:19,20 35:19
  43:10,14,14
  52:16 59:20
  61:16
**clause** 37:17,21
**clear** 1:6 2:22
  5:14,25 7:4
  12:24 13:5,9

  15:1,10 17:4,5
  17:13,20,20,23
  18:3,6 20:14
  21:22 22:9,13
  22:21 23:3,5
  26:17 28:11,13
  30:10 33:11,21
  34:10 35:19
  36:18 47:4
  48:7,13 49:21
  50:23 51:1,19
  51:22,24 52:1
  52:1,5,8,12
  53:24 54:7,15
  54:17 55:7,22
  55:24 56:9
  57:12 58:1
  59:16 60:10
  63:18 65:13
  69:9
**clogged** 31:5
**CO2** 35:8
**Coast** 14:8
**cockpit** 31:8
**cockpit/deck**
  31:6
**coding** 66:18
**collision** 68:17
**come** 27:14
  35:21 41:15,16
  42:4 43:8 50:1
**comes** 17:21
**comment** 18:9
**commission**
  70:17,17 71:23
**common** 57:13
  57:16
**communicated**
  11:9
**communication**
  10:4
**companies** 7:14
  57:17
**company** 1:7
  5:15,21 6:1,9
  6:11,18 7:5,8,9
  7:11 8:8 10:18

  11:7 13:16
  17:19 21:20
  22:18,22 23:25
  26:4,25 28:17
  40:25 41:8
  63:19
**competent** 36:11
**complaint** 51:16
**complaints** 8:11
**complete** 26:12
  44:2
**completed** 44:4
  67:3
**completeness**
  57:20
**complied** 49:24
  59:17
**comply** 34:21,22
  59:4
**compute** 63:19
**computed** 64:3
**concept** 23:6,9
  28:14,17 44:9
  44:23 54:15
  60:21 61:20
  67:4,5
**Concepts** 5:20
  6:6,14,25
  23:16
**concerned** 35:14
**concerning** 9:20
  10:20 11:1
  35:10 49:9,22
  57:22 60:16
**concluded** 69:23
**concludes** 64:17
**conclusion**
  24:17 31:9
**condition** 5:9
  21:25 22:5
  37:1 39:4 63:1
**conditions** 31:2
  38:1,18 49:13
  49:25
**conduct** 8:5,8
  42:16 47:16
  48:7,13 57:17

64:19
conducted 25:3
31:8,17 35:15
41:2 57:10,24
confidential
9:17
confined 36:14
connect 41:17
connected 9:15
41:5,20 43:20
61:23
connections
35:24
consequence
19:1 42:24
consider 18:2
42:8
constitute 71:11
constructive
64:4
contact 19:23
contain 30:14
35:9 37:21
58:19
contained 18:10
32:19 43:11
57:21 58:21,23
container 24:4
contains 41:12
contention 30:11
continue 22:25
contract 23:1,2
35:3
contrary 49:5
control 8:4,6,7
conversation
11:4 61:23
conversations
10:9,19,23
11:1,3
copied 19:20,25
copy 18:1
Coral 2:6
corner 16:6
corporate 4:3
5:25 41:11
correct 5:16

15:23,24 17:3
22:15,16 23:10
23:11 25:6
27:7,8,10,11
27:21,25 28:12
28:19,23,24
38:14 39:19
40:3 43:18
44:8 45:10
46:5,7,8 47:13
47:14 48:5,6
48:25 49:1
50:12 52:6,7
52:10,11 54:1
54:6,9,18,22
54:25 55:2,3
55:10,14 58:11
59:14 61:12,13
61:20 62:24
63:8,16 64:9
64:12 65:15,23
65:24 66:5,6
66:24 67:10
68:25 71:11
correspondence
10:8,10,14
61:23
corroded 35:24
corrosion 24:3
33:24 34:4
40:8 68:14
cost 63:23 64:5
counsel 9:18
10:11 13:8
50:18,19,21
71:13
County 70:5
71:3,17
couple 47:11
53:15
course 9:17 34:5
36:24,24 67:21
Court 1:1 4:12
7:12
coverage 12:23
12:24 13:5
18:12,17 22:14

22:19 23:13
24:9,10 26:6
29:13 30:9
39:20 40:11,22
44:3,3 50:4
51:20 69:13
covered 55:12
create 15:14,18
16:16
created 31:23
63:25
crew 36:11 39:6
39:7
criminal 4:5
Cristina 2:3 3:7
4:22 57:25
CROSS-EXA...
2:16 65:4
Crystal 33:2
48:1
CSRYP/204845
28:10
current 6:17
35:15
currently 5:17
5:19 7:8,14 8:2
44:3 45:21
Customer 69:6
cv 1:5

_____
        D
_____
D 2:14
Dade 70:5 71:3
71:17
Dallas 6:10
damage 24:18
33:15 56:21
57:1,1 63:23
damaged 24:15
53:18,20
damages 8:15
63:19 64:2
data 44:4
database 9:14
10:6 21:16
41:6,12 42:10
43:9,12,14,18

43:19 44:16
46:12 47:22
date 13:17 15:3
15:8,8 20:4
21:13,14 22:8
22:13 25:13
28:5 35:17
36:21,23 49:8
50:13 53:25
63:10,13,20
64:20
dated 16:18 52:4
71:17
dates 23:12
27:19 37:4
day 36:24 42:24
70:11 71:17
days 22:12
de-merger 6:13
dead 31:5
deal 7:2,3 62:13
dealt 62:8
December 23:2
29:5 50:15
52:4
decided 51:22
52:2
decision 12:20
12:23,24 18:3
decisionmaking
59:23
declaratory
13:13
deductible 50:5
defendant 1:13
3:8
Defendant's
2:18 9:24
39:12 46:18
52:21 55:24
58:15 64:15
definition 38:23
definitions
38:24
degree 7:24
Delancey 11:19
12:12 19:19

50:17 61:14,17
denial 2:21
13:12 29:4,5
30:9 33:9,18
33:22 36:3
39:24 46:25
50:9,10,23,25
52:19,21 56:17
denied 12:22
24:10 29:3
40:7 48:1 55:1
deny 13:11
51:21 52:3
denying 56:16
department
11:16 12:9,11
42:16 44:20
47:16
departments
10:18 42:14
Depending 13:3
depends 68:11
deponent 70:8
deposed 3:13
deposition 1:19
1:25 2:20 3:16
9:2,5,9,23,25
10:3,21 11:7
11:10 12:1,6,7
50:11,25 51:20
53:11 64:20
69:17,22,23
71:8
deputy 60:22
describe 15:19
described 38:21
68:12,13
Description 2:19
detail 45:19
detailed 18:13
42:17
detectors 35:8
deterioration
24:11 33:19
40:9
deteriorations
29:18 35:20

**determination**
  15:2 51:21
**determine** 48:8
  48:14
**develop** 36:23
**differences**
  26:11
**different** 36:21
  41:21 43:1
  45:18 68:2
**DIRECT** 2:16
  3:5
**directly** 17:20
**director** 5:20
  6:19,22,23
  7:18 8:7 11:18
  19:20
**disclose** 29:25
  39:25 47:2
**disclosed** 67:12
  68:3
**disclosures** 2:23
  60:9,10 64:14
  64:16
**discoverable**
  60:12
**discuss** 4:11
  12:4 19:22
  37:20 50:22
**discussed** 28:20
  50:24 51:19
  54:20 55:2,7
  56:14,17,18
  60:13 61:14
  63:9,14,17
  65:16
**discusses** 49:12
  57:10
**discussing** 19:9
  23:9 38:13
  39:18 56:12
  65:19 67:6
**discussions** 11:6
**dispute** 54:2,3
**disputes** 53:24
  54:4,4
**DISTRICT** 1:1

1:2
**DIVISION** 1:3
**document** 8:20
  8:23 10:23
  15:18 26:3
  38:12 39:17
  44:1 46:9,11
  52:24 53:5
  56:5 58:12,22
  58:24,25 59:20
  60:3,6,8,11
  65:12 66:8
  67:1 69:10
**documentation**
  6:3 11:24
**documents** 9:7
  9:11,15 10:7
  10:13,15 19:19
**doing** 45:20
  61:21 69:19
**double** 27:22
**double-check**
  25:18
**Douglas** 2:5
**downs** 31:11
**drafted** 50:16,18
**drains** 31:5
**draw** 24:17
**drugs** 5:6
**due** 25:17,19,22
  45:14,17 53:18
**duly** 3:3 70:9
  71:9
**duration** 38:5
**duties** 5:23
  58:19,20 59:5
  59:11

_____
**E**
**E** 2:14 42:7
**e-mail** 10:17,24
  11:2 20:18,20
**e-mails** 11:5
**earlier** 18:21
  50:11 64:11
  65:16,17 67:6
**economics** 7:22

**education** 7:20
  7:21
**effect** 27:25 28:6
  28:9 67:11
**effective** 27:10
  27:19,20
**effectively** 6:8
  22:24 51:24
  56:24 57:6
**eight** 66:19
**either** 11:18
  69:11
**elaborate** 12:25
**elected** 22:24
  24:5
**electronic** 9:15
  11:23
**employed** 5:18
  5:19 71:14
**employees** 27:1
**engineer** 14:2,7
**England** 19:1
**English** 18:25
**enormous** 41:6
**entering** 24:19
  24:22 25:10
**entirely** 57:20
  58:6
**equipment** 39:5
  49:6,15,16
  50:3
**errors** 69:17
**especially** 67:22
**ESQUIRE** 2:3,8
**essentially** 57:2
**establish** 43:13
  67:19
**established**
  29:15
**evaluating** 8:15
**evening** 20:21
**event** 24:12
  29:13 31:25
  33:11,13 56:21
  57:2,5,7 58:20
  59:5,11
**events** 5:11

56:20
**everybody** 6:23
**evidence** 33:12
  33:14,21 56:25
**EXAMINATI...**
  2:16 3:5
**examined** 3:4
**example** 19:21
  45:24 50:1
  60:14 68:16
**exceed** 64:5
**exchange** 11:5
**exclusion** 64:8
**exclusions** 18:11
**executive** 12:19
**Exhibit** 9:23,24
  39:11,12 46:16
  46:18 52:20,21
  55:22,24 58:13
  58:15 64:13,15
**EXHIBITS** 2:18
**existence** 37:1
**existing** 23:6,9
  28:14 45:17
**expand** 36:5
**experience** 8:18
**expert** 4:6,7
**expiration** 48:16
**expired** 23:2
  30:7 48:22
  49:7,20
**expires** 70:17
  71:23
**Expiring** 44:3
**explain** 10:13
  56:20
**explained** 38:21
**express** 37:16
**expressed** 37:21
**expression** 22:7
**extent** 43:12
  63:23
**external** 24:12
  29:12,12 32:21
  33:11,13 36:16
  57:5
**extinguisher**

35:11 48:21
  49:3,20
**extinguishers**
  30:3,6 34:6
  35:13,16 46:22
  48:3,8,14 49:7
  49:10
**extinguishing**
  49:15 50:3
**extremely** 13:25

_____
**F**
**fact** 29:6 51:12
  62:6
**facts** 30:10 33:2
  33:11,20
**failed** 30:21
**fair** 5:1
**familiar** 3:19
**far** 26:7 35:13
  57:19 59:7
  66:21
**federal** 19:3
**feels** 14:24
**field** 14:19,22
  15:1,13,14
  16:1,9,15,24
  17:17 19:4,4
  31:17 32:13,15
**fifth** 11:16 29:22
  54:10
**file** 9:16 10:5,7
  10:12 11:3,4,5
  11:12,13,17,22
  12:5,6 15:21
  15:23 16:13
  19:12,13 20:1
  20:25 21:4
  22:18,21 23:9
  23:12,17 26:7
  32:2 37:3
  41:20 43:6
  45:13,22 49:2
  65:8,14 66:1,7
  66:25 68:22
**filed** 24:7
**files** 10:6,8

11:23 12:7
**fills** 43:25
**final** 31:14 47:25
   51:21
**Finally** 30:2
**Financial** 8:5,8
**financially**
   71:15
**find** 42:12
**finding** 17:12
   39:6
**findings** 14:24
   15:15 16:17
   30:14
**fine** 4:22 28:6
**fire** 30:3,3,6,6
   34:6 35:11,13
   35:16 46:22
   48:2,3,8,8,14
   48:15,21,21
   49:2,3,6,6,10
   49:10,15,20
   50:2
**firm** 52:10,13
**firms** 52:15,17
**first** 12:17 22:8
   22:10,13 30:10
   38:11,24 39:16
   42:22 53:5
   66:12 71:9
**fit** 39:3
**fitted** 30:19
   49:15
**five** 11:16
**fixed** 24:14
**flags** 68:15
**float** 36:9,10,14
**Florida** 1:2,24
   2:6,11 20:22
   62:10 70:4,16
   71:2,6,17
**flow** 30:23,24
**folder** 11:23
**following** 20:24
   29:6 30:2
   31:17 48:2
**following-nam...**

70:8
**follows** 3:4
**followup** 26:20
**foregoing** 71:10
**forensic** 42:17
**forensically** 41:3
   42:12
**form** 26:8,10,10
   26:13 40:5,12
   40:13,22 41:25
   42:15 47:9,10
   51:9 57:20
   58:6 66:3 67:4
   67:5,14,17
   68:4
**formal** 8:17
**Forster** 20:16
   62:9
**fortuitous** 56:20
   56:21
**fortuity** 24:12
   29:9 40:7 57:3
**forward** 18:19
**Fourteen** 16:14
**fourth** 30:23
   36:3 53:16
**Fourthly** 29:18
**French** 62:1
**frequently** 42:25
**friend** 14:13
**Ft** 2:11
**fuel** 24:3,5 63:15
**full** 9:14 18:8
   26:8 40:12,21
   63:22 64:7
**fully** 67:3
**functioning**
   33:23 34:3
**functions** 6:1
**further** 64:18
   71:13

**G**

**Gables** 2:6
**gap** 26:6 40:11
**gear** 39:5
**general** 5:22

34:25 38:1,18
   49:13 54:17
**generally** 41:23
**generating**
   11:24
**gentleman** 13:22
   14:20 62:2
**germane** 43:6
**gestures** 4:14
**GG** 70:17
**Gilhooly** 60:14
   61:7
**give** 13:10 17:12
   17:19,19,23
   18:23 44:23
   65:7
**given** 18:22
   51:15 52:9
   58:22
**gives** 33:25 42:9
**giving** 5:10
   12:25
**go** 3:20 4:24 5:1
   8:14,19 9:22
   13:5,8,9 14:23
   17:20 18:20
   32:5 34:15
   36:12 39:10,15
   45:20 46:16
   52:19 55:21
   58:13 59:22
   64:13
**goes** 41:14
**going** 3:20 4:9,9
   4:18 8:19 9:22
   17:1 19:17
   38:8 39:23
   41:15 42:25
   43:21 45:7
   46:6 47:24
   50:7 55:4 57:4
   57:9 61:4
   62:16 65:9
**Goldman** 2:8,9
   2:16 14:9
   16:10 18:18
   22:2 31:21

32:14 33:5
   35:22 36:7
   50:21 56:23
   64:23 65:5
   67:15,24 68:9
   69:14,21
**Goldman's** 52:9
**good** 3:7 14:9,17
   25:23,25 26:1
   49:17 69:19
**gotten** 50:2
**gradual** 24:11
   29:17 33:19
   35:19 40:9
   57:8
**gradually** 33:16
**Grammar** 8:1
**Grant** 14:21,22
   15:3 31:18
**Great** 7:5 22:20
   22:24 23:4,7
   23:16 28:15
   51:13
**greater** 67:19
**grounds** 30:9
   51:6
**Group** 62:15
   66:4,10 69:5
**Guard** 14:8
**guess** 24:14
   32:21 40:1
   45:1,8,25 53:4
   54:3,14 57:16
   57:23 60:24
   61:19
**guidance** 59:20

**H**

**H-I-C-K-E-L**
   25:4
**Hallandale** 32:8
**hand** 4:14 70:11
**handled** 12:8
**handler** 12:12
**handling** 12:10
   13:20 19:18
**handwritten**

46:7
**happens** 37:11
**happy** 4:20
**hatch** 31:6
**Hatcher** 26:24
   27:2 28:20
   61:3,8
**head** 13:25
**headed** 59:11
**hearing** 18:19
**heavily** 42:14
**heavy** 33:24
**held** 6:20 25:24
**Hellman** 2:9
   18:18 50:21
**Hickel** 25:4 63:5
**higher** 50:5 68:7
**highest** 7:20,21
**highlight** 18:1
**highlighted**
   18:11
**highlighting**
   45:16
**highlights** 26:10
**highly** 14:1
**hired** 21:23
**hold** 8:2 55:15
   62:18
**hose** 31:7
**hours** 20:21
**house** 32:7
**hull** 39:5,22
   44:14,15 45:3
**hundred** 3:17
   42:23
**hundreds** 41:13
   41:13,13
**hurricane** 23:1
   28:25 32:5

**I**

**idea** 14:3 36:25
**identification**
   9:25 39:13
   42:1 44:14,15
   45:3 46:19
   52:22 56:1

58:16 64:16
**identify** 53:2
60:7
**impact** 33:15
56:25
**implied** 37:14
**in-water** 25:25
**inaccurate** 40:19
**inasmuch** 30:17
**inaudible** 7:25
8:1
**incepted** 28:2
**inception** 21:7
29:19,20 30:8
34:9,19 38:7
55:9,11 59:1,2
**incident** 32:5
33:16 34:15
36:1 37:8
41:19 59:3
**include** 49:9
**included** 15:22
43:18 44:6
66:22
**includes** 39:6
49:17
**including** 9:16
**inclusive** 22:12
71:11
**incorporate** 51:4
51:17
**independent**
21:21
**indicate** 22:18
32:2,12 33:3
37:4 49:2
**indicated** 29:7
29:10,19
**indicates** 30:3
48:2
**indicating** 31:1
33:24
**indication** 24:13
42:9
**individual** 26:22
63:19
**individuals** 60:6

**industry** 57:14
**inevitability**
57:3
**influence** 5:6
**information**
9:17 16:16
17:18 34:1
41:18 43:6,25
44:24 45:7,11
45:13,21 46:4
46:6,10 47:5
48:24 49:21
57:21 58:7
60:12,15 69:7
**ingestion** 30:17
**ingress** 31:4,6,13
**inhibit** 5:7
**initial** 40:4
68:14
**inoperable**
30:23,24 35:24
**input** 45:8,11
**inquiry** 9:8,20
**Inside** 32:23,24
32:25
**inspect** 14:21
15:3 16:22
34:16 55:5,8
**inspected** 15:11
15:19 21:6
**inspecting** 19:9
31:22
**inspection** 15:9
15:15 34:17
**inspects** 35:2
**installed** 49:16
**instance** 14:20
31:20 43:7
**instances** 40:19
42:18
**insurance** 4:10
7:9,13 20:16
20:17 22:20
23:16 26:4
34:15 35:3
38:7 40:18,25

57:17 62:8,9
62:12,15 66:4
66:10 69:5
**insure** 37:15
**insured** 10:17
20:11 21:23,24
22:22 23:24
26:3 29:4 32:3
32:4 34:13,19
34:21,25 35:5
39:24 40:15,15
41:24,24 42:3
44:7 45:7,14
46:7,10 49:24
58:3,22 67:8
67:12 69:6
**insured's** 32:7,9
57:12 66:22
**insureds** 24:14
47:17
**insurer** 24:2,24
68:2
**insurers** 4:3 7:2
7:3 57:19
**insuring** 38:6
66:14
**intact** 48:4
**intended** 36:9
39:3,9,9
**interested** 71:15
**internal** 30:17
**internally** 10:9
10:18
**Interrogatories**
2:23 53:4
58:14,16
**interrogatory**
56:3,15
**intervene** 19:23
**invariably** 19:16
**investigate** 13:3
54:16,19
**investigated**
34:9
**investigation**
13:4 17:7 29:6
29:10,15,19,22

29:23 30:2
42:17 48:2,13
57:22 61:19
**investigations**
57:10,17 58:4
58:9
**invited** 17:7
**involve** 6:1
**involved** 40:14
61:2,11,22
**involvement**
12:3 14:17
19:5 62:4
**issuance** 26:2
**issue** 17:22
19:21,24 24:14
25:5 28:24
43:3 50:5 51:2
52:17
**issued** 13:12,13
22:8 27:7 29:1
44:9 48:21
49:3 52:5
59:20 60:1
**issues** 13:4 17:6
18:1,6,10,17
19:9 27:2,5
28:22 50:24
52:16,18
**issuing** 49:22
57:18,24
**item** 60:2
**items** 35:10,18
50:22 59:5,13
**itinerary** 45:20

| **J** |
| JACQUELINE
2:8
**Jacquie@gold...**
2:12
**job** 55:16 69:19
**Johns** 7:25
**joined** 11:17
**July** 21:11,19
22:1,6,11,11
22:14,17 23:13

23:14,14,19,19
23:20,21,22,22
24:19,23,25
25:4,14,15,19
27:23,24 28:2
28:2 29:25
35:16 40:2
44:21 45:15
47:2 66:10
**June** 62:22
**junior** 11:21
61:7
**Justin** 61:25

| **K** |
**K** 38:25 39:1,2
49:14
**kept** 32:3
**Kim** 26:24 28:20
61:3,8
**kind** 5:21
**Kingdom** 8:5
**know** 3:17 4:13
4:19,24 7:12
12:14 13:20,24
14:3 15:10
16:6,11 22:23
26:22 35:4
40:25 42:5
51:19 62:21
63:10 66:21
67:21 68:12
**knowledge** 9:19
60:16,17,19,20
60:24 61:18
63:1
**Kopshop** 11:20

| **L** |
**lack** 29:18 33:20
35:20
**Lakes** 7:6 22:20
22:24 23:4,7
23:16 28:15
51:13
**land** 32:10
**language** 37:14

37:18 38:25
48:19 49:9
66:23 68:23,24
**Large** 1:24 71:7
**Lauderdale** 2:11
**launched** 31:3
**law** 12:17,17
52:9,13,15,17
**laws** 19:1
**lawyer** 12:16
**lawyers** 18:24
18:25,25
**lead** 12:12 19:12
19:17,17
**leave** 51:16
**legal** 12:19 13:6
13:7,8,10 17:4
17:9,24 18:4,5
18:22,23 19:2
51:25,25 52:2
52:5,9,13
**let's** 15:5 16:3
30:17 32:5
39:10 42:6
67:25
**letter** 2:21 13:12
29:4 50:9,10
50:13,16 52:4
52:19,21
**letters** 14:15
**level** 7:20,21,21
**Liam** 60:14 61:7
**license** 8:12
**licensed** 14:5,6,7
**licenses** 8:3,9
**lightning** 57:1
68:17
**Likewise** 19:25
**limit** 39:20
**Limited** 5:20
67:4
**limits** 45:19 64:7
**Linda** 41:10
**Lindsay** 11:20
**line** 16:6
**linked** 26:7
**list** 35:12,18

**listed** 9:8,20
35:11 56:11,14
59:13
**lists** 60:6,11
**literally** 11:22
41:12
**little** 21:15 53:8
**LLC** 1:10 3:9
41:9,11,17
67:9
**Lloyd** 7:9
**Lloyd's** 7:10
**local** 20:22 62:8
**located** 41:3
45:25 59:9
**LoLette** 42:4
**London** 7:10
**long** 6:6,20
31:10,20,24
36:25 37:10
42:11,12
**look** 18:13,19
21:14 37:13
39:2,16
**looked** 19:24
64:11
**looking** 14:9
17:16 21:12
42:5 47:13
48:25
**looks** 69:9,11
**loss** 20:4 24:2,7
24:10,15,21
29:6,8 30:1,2,9
30:12,15 31:2
31:9,15 33:3,4
36:14 40:1,7
40:14,20 41:1
41:3 47:3,5,21
48:2 53:25
58:19,20 59:5
59:12 63:9,11
63:13,20 64:4
67:12,21 68:1
68:12,13
**losses** 23:1

**lot** 11:21 14:15
63:17
**low** 31:12

_____

**M**

**machinery**
30:25
**main** 46:15 54:4
**maintained**
11:17 34:2
49:17
**maintenance**
11:22 20:1
29:18 33:20
34:18 35:20
46:22 61:22
**Management**
62:12
**manager** 11:19
60:23
**managing** 5:20
5:22 6:19,22
6:23 7:17 8:7
54:16
**manual** 30:22
**Marathon** 15:7
20:7 32:5
**March** 30:5,7
35:14 48:9,16
49:4,20
**marine** 4:4
37:15
**maritime** 57:16
**mark** 9:22 11:18
19:20,21 39:10
46:16 51:15
52:19 55:22
58:13 64:13
**marked** 9:25
39:12 46:19
52:22 55:25
58:16 64:16
**marks** 30:25
31:23,23,25
32:12,21 34:4
35:23 36:23
37:8

**Martinez** 2:4
**master's** 12:17
**MasterCard**
69:8
**matter** 18:16
19:3
**mean** 10:22 19:7
19:14 21:8
36:18 50:19,21
51:7,8 56:19
64:7
**means** 27:24
36:6 39:3
44:25 66:17
**medical** 5:9
**medication** 5:7
**member** 11:21
**memory** 53:13
**mentioned** 8:12
12:1 18:21
19:11 24:16
32:16 34:8
35:18 50:10
56:19 65:18
**mentioning** 28:2
**met** 62:1
**method** 20:19
**Miami** 1:3 62:10
71:17
**Michael** 14:21
14:22 15:3
31:18
**minute** 62:19
**minutes** 55:16
**misrepresenta...**
51:14,17
**misrepresented**
47:5
**missed** 17:10
**mode** 30:21,22
**Mom** 1:10 3:9
41:9,11,15,16
54:12 58:25
59:4,24 62:8
62:20 67:9
**moment** 65:7,16
**months** 36:25,25

36:25
**Morales** 2:4
**morning** 3:7
20:24 21:3,5
**multiple** 30:25
42:11
**Munich** 7:6
**Myriam** 1:22
69:19 70:7,16
71:5

_____

**N**

**N** 2:14
**name** 3:7,9,11
6:11 14:14,15
26:22 41:11,23
42:2,4 62:7
67:8
**named** 7:15,16
**names** 6:9
**navigation**
45:18
**navigational**
45:19
**necessarily**
10:23
**necessary** 49:19
64:21
**Ned** 25:3
**need** 4:23 64:20
69:11
**needed** 7:22
**negotiated** 23:2
**never** 42:19 58:8
62:1
**new** 23:5 25:7
25:14 28:13
40:12 41:20
43:7 47:16
48:21 49:22
61:10 65:18,21
67:7,7 69:6
**nice** 7:23
**night** 20:23
**nine** 38:1,18
49:14
**nods** 4:14

**non-** 47:7 51:10
**non-renewal**
  51:2,7,18
  65:22 67:13,20
  67:20 68:1
**non-renewed**
  23:23 40:10,17
  40:18,20 51:12
  67:23
**nonrenewal**
  24:1,22
**normal** 68:6
**normally** 25:23
  32:6,8 35:1
  42:20
**Northwest** 62:9
**Notary** 1:23
  70:16 71:6
**note** 11:3,4
  25:19 27:2
  28:22
**notes** 15:19
  17:16 71:12
**notice** 1:24 2:20
  9:2,4,9,23,24
  67:2
**noticed** 20:8,11
**November** 16:19
**number** 16:4,11
  28:8 40:13
  42:1,6,7,8 44:9
  44:13,14,15,22
  44:22 45:3
  66:12
**numbered** 71:10
**numbers** 16:5

————————
**O**

**o'clock** 21:3,5
**O-U-I-M-E-T**
  61:25
**OATH** 70:1
**object** 33:15
  68:18
**Objection** 16:10
  31:21 32:14
  33:5 35:22

36:7 56:23
  67:14,17 68:4
**obligation** 5:3
**observed** 32:13
**obtain** 7:23
  52:13
**obtained** 51:25
  52:5
**obviously** 10:10
**occasion** 4:4
**occur** 17:2 63:10
**occurred** 24:21
  26:11 32:5
  41:1 57:2
  63:11
**occurring** 31:4
  31:14
**October** 1:15
  70:12 71:18
**office** 5:24 9:12
  17:13 19:8
**official** 70:11
**Oh** 19:14
**okay** 4:21 27:14
**once** 13:9 16:15
  17:2,17 23:5
  28:25 41:18
  42:18 44:6
  49:18,18 58:9
**one-time** 31:20
**ones** 7:15,16
**operate** 30:21
**operated** 30:22
**operation** 6:15
**opinion** 13:6,7,8
  13:10 16:17
  17:2,4,9,24
  18:4,5,20,22
  18:23 19:2
  51:25 52:1,2,5
  52:9
**opinions** 17:22
  52:13
**opposed** 11:23
  24:11
**order** 17:1 36:9
  49:17 69:21

**origin** 62:1
**original** 47:8,10
  47:20 66:3
**originally** 6:9
  26:5 50:18
**Osprey** 6:11,12
  6:13 7:1
**Ouimet** 61:25
**outcome** 13:4
  71:15
**outside** 32:22
**outstanding**
  28:24
**owed** 54:23
**owned** 7:6

————————
**P**

**p.m** 1:16 69:24
**page** 2:19 38:2
  38:11,15,24,25
  38:25 39:1
  45:11 46:6
  49:13 59:10
  65:25 66:5,5,7
  66:14,25 68:21
  69:3
**pages** 71:10
**paid** 54:24
**paragraph**
  38:19,25 49:14
**pardon** 67:7
**Parker** 61:6
**part** 11:5 15:25
  16:8 43:15
**partial** 29:7,11
  29:16,20 53:18
  53:20 54:5
**partially** 20:9,12
  20:13 21:1
  44:2 53:25
**particular** 19:24
  55:16
**parties** 54:3
**parts** 39:5
**party** 4:5
**paying** 69:8
**payment** 68:7

69:8
**pending** 4:25
**people** 7:17
  18:24 19:14
  56:11 61:2
  62:11 67:23
**percent** 7:6
  68:11,20
**perform** 5:23
**performed**
  45:15
**period** 21:7
  22:10 23:23
  24:6 25:6,9,11
  26:12,13,15
  34:10,20,20
  37:2,9,19
  39:17 43:23
  55:11 59:1
**periods** 31:1,24
  47:12
**permanent**
  10:24
**person** 9:19
  12:20 19:17
  45:4 55:17
  63:5
**personally** 70:8
**phonetic** 11:20
  25:13 61:3
**photographic**
  53:13
**photographs**
  15:25 16:3,4,7
  16:12 32:15,16
  32:20
**physical** 29:8
  30:12 33:4
  39:4
**physically** 46:13
**picked** 47:19,21
**pictures** 16:8
**place** 9:3 11:22
  15:9 25:17
**placed** 28:15
**Plaintiff** 1:8
**plan** 28:25 32:6

45:17
**pleaded** 51:3
**please** 3:9 4:11
  4:19,23 5:17
  8:25 10:2
  18:15 20:3
  28:8 33:20
  36:4 39:11
  45:19 50:13
  53:2 57:25
  60:7 65:6
**pleasure** 66:19
**point** 13:11 17:3
  17:22 21:6
  31:13,14
**policies** 6:3
  41:17 43:15,20
  55:8 57:18,18
  57:24
**policy** 2:20 21:7
  22:8,9,10,14
  23:13,15,20,22
  23:22 24:6,20
  24:23 25:5,9
  26:2,15 27:6,9
  27:19,20,22,25
  28:1,1,8,11,14
  29:1,14,20
  30:8 34:10,20
  34:20,23,25
  37:12,13,15,17
  37:19,20,24
  38:2,12,20,22
  38:25 39:11,12
  39:15,17,21
  40:6,10 41:4,7
  41:8 42:8,18
  43:4,5,7,23
  44:17,22 47:11
  47:15,19 48:18
  49:9,12,22,25
  51:10,13 54:24
  55:6,11 57:11
  58:18,21,23
  59:1,2,6,8,18
  59:20,22 60:1
  61:1,12 62:14

————————

64:7,8,10
65:22 66:1,8
66:19,23 67:1
67:7,22,23
68:23,24 69:2
69:3,6,12
**portion** 32:22
38:22 44:5,6
46:1
**position** 6:17,20
36:19 47:4
60:21
**possible** 31:19
64:25
**possibly** 42:3
**potential** 41:24
58:3
**pre-inspections**
48:17
**pre-underwrit...**
34:16
**preceding** 26:11
**precise** 41:14
**premium** 50:5
54:23 68:8,19
69:8
**prepare** 10:2
11:25
**prepared** 33:7
**prepares** 11:12
46:9
**presented** 41:9
41:10,20 42:15
66:4
**presumably**
24:4 27:6
**presumption**
36:17
**pretty** 36:8
58:12
**prevent** 5:10
**previous** 6:9
23:18 28:1
41:3 47:19
**previously** 23:7
26:7 28:15,20
35:10 41:7,7

43:3 56:12
63:14
**primarily** 22:25
61:21
**principals** 5:24
7:2
**prior** 10:20
11:10 21:6
22:17 23:20,21
24:19,22 25:10
25:21 26:2,14
31:2 34:9,19
35:2,3 36:22
43:10 46:9
49:22 53:11
55:5,8,11
57:10,17 68:1
**private** 66:19
**probably** 62:1
67:18 68:11,19
69:7
**problem** 21:17
**procedure** 12:25
19:15
**proceed** 52:3
**process** 3:20
41:14 59:22
68:6
**produced** 65:13
**producing** 10:15
10:16 62:14
**professional**
1:22 8:2 71:5
**programs** 41:6
**prolonged** 31:1
37:2
**prompted** 67:18
**proper** 39:8
**properly** 34:2,6
49:16 68:13
**property** 1:6
5:15 6:1 7:1,4
15:11
**proposed** 66:23
68:24
**provide** 17:13
45:13 50:3

**provided** 9:12
9:16 10:16
16:15 22:14
24:9 25:1,2,20
32:15 33:7
35:1 40:23
44:6 47:9,11
55:12 58:7,24
58:25 59:21,24
59:25 61:19
64:8 69:5,10
69:11
**provides** 14:22
17:18 43:3
**providing** 22:18
**provision** 37:14
38:20 49:12
**provisions** 59:17
**Public** 1:23
70:16 71:6
**pull** 56:4 65:7
**pump** 30:22,23
34:5
**pumps** 30:20,21
33:23 34:3
35:24
**purchase** 6:4
62:20 63:2
**purchases** 45:4
**Purely** 41:5
**purpose** 12:7
39:3,9 43:2
**purposes** 12:5
**pursuant** 1:24
39:21
**put** 18:14 19:17
41:15 45:17
46:10

————————
**Q**
**qualification**
12:19
**qualifications**
12:14 13:24
14:3,13
**qualified** 12:16
14:1,6,6,7

18:24 19:2
**query** 19:22
**question** 4:12,15
4:17,18 17:15
17:17 22:3
27:18 48:11,12
51:9,14 54:14
56:15 57:9,25
61:4
**questioning**
65:17
**questionnaire**
2:21 26:9,14
26:19,23 27:3
27:6 28:18,21
28:22 29:24
40:2 43:22
45:9 46:17,19
46:21 47:1,6
47:12 57:24
58:2
**questionnaires**
58:10
**questions** 4:10
4:19,25 5:11
14:24 27:12
40:13,14 53:11
53:15 55:20
56:8 64:17,18
65:1,6
**quick** 27:13
**quite** 31:24
**quotation** 59:25
66:4,9,20,21
67:2
**quotations** 67:3
**quote** 42:6,23
44:9,22 66:11
66:12,12 68:25
69:1
**quoted** 24:25
42:7 44:3

————————
**R**
**R-E-V-E-L**
13:22
**rain** 31:11

**raised** 17:6 18:2
**reach** 22:22
**read** 16:6 35:12
69:16,18
**reading** 38:15
53:7 69:22
71:9
**really** 18:8 69:9
**reason** 4:23
23:25 29:2
36:16 47:25
**reasonable** 39:8
39:8
**reasons** 33:1
56:16
**recall** 21:5 32:16
51:9 53:13
65:18
**recalling** 5:11
**receipt** 28:23
40:21
**receive** 13:9
**received** 26:17
28:25 29:1
43:1 58:10
63:22
**receiver** 31:6
**Recess** 27:16
55:18
**recharging**
49:19
**recognize** 8:23
52:24 54:7
56:5 60:3
**recommendati...**
34:22,24 35:1
35:5,10
**recommended**
17:3
**record** 3:10 9:1
10:24 24:13
39:10 50:14
53:2 60:8
64:22,23 65:25
**recorded** 43:12
**records** 34:19
41:14 43:14,14

**red** 68:14
**referred** 5:22
**referring** 10:3
  28:5 66:2
**refers** 59:21
**regard** 35:23
  48:17 51:17
**regarding** 4:10
  10:10 11:10
  12:21 27:19
  35:11 37:17
  41:18 46:22
  60:25 63:14
**regardless** 57:4
**Registered** 1:22
  71:5
**regulated** 8:7
**reinsurance** 6:5
**related** 71:14
**relates** 47:8
**relatively** 14:14
  37:2
**relevant** 14:10
  18:10
**relied** 16:24
**rely** 42:14 57:11
  57:19 58:6
**relying** 30:11
  33:3,6,12,21
  51:1
**remain** 37:18
**remember** 21:4
  53:12
**renew** 24:6
**renewal** 2:21
  26:13,14,19,23
  27:3,5 28:11
  28:18,21 29:24
  40:1 43:22
  46:17,18 47:1
  47:8,12 49:22
  57:23 58:2,10
  61:1,9,12
**renewals** 60:25
  61:10
**renewed** 47:11
  47:15 48:9,15

51:11
**renewing** 55:5,8
  57:10,18
**repair** 63:24
  64:5
**repaired** 24:17
**repeat** 17:15
  20:10 22:2
  48:12 57:25
**rephrase** 4:20
**report** 15:2,5,8
  15:14,18 16:16
  16:18 17:7,11
  17:12,19 18:1
  18:3,7,8,10,11
  18:13,16 30:13
  30:14,18 32:12
  33:2,6 36:14
  61:19 63:22,22
  63:25 64:3
**reported** 13:2
  15:16 20:6,14
  20:15,18,20
  21:1 33:16
  54:12 59:3
  71:7
**reporter** 1:23
  4:12 7:12 39:2
  71:5
**reporting** 6:4
  54:11
**reports** 34:18
  37:3
**represent** 65:12
**representation**
  57:12
**representative**
  5:25 19:12
**represented**
  40:11
**request** 2:22
  53:16 54:10
  55:21,23,25
**requested** 9:8
  25:10 26:14
  28:18
**requests** 53:5

**require** 18:9
  26:9 34:13,18
  34:21 45:18
  55:9
**required** 24:23
  25:1,7,22 26:3
  26:8 49:21
**research** 48:7
  67:19
**reserve** 64:19,22
**responded** 40:16
  51:11
**response** 2:22
  9:4 53:19
  55:22,25
**responses** 53:3
**responsibility**
  39:6 42:21
**responsible** 6:24
**result** 18:2 53:20
**resulted** 67:13
**resulting** 31:11
**results** 68:3
**retail** 62:6
**retain** 54:15
**retained** 21:23
  63:18
**reveal** 21:25
**revealed** 29:23
**reveals** 15:6
**Revel** 13:22
  14:14,23,23
  15:16 16:16,16
  16:22 17:2,10
  31:16 56:12
  63:17 64:1
**Revel's** 17:16
  18:7
**review** 6:3 9:7
  26:19 53:10
**reviewed** 10:5,5
  26:23 28:21
**reviewing** 11:13
  12:5,6,6
**rhetoric** 18:14
**right** 5:15 46:4
  53:25 54:21,24

55:9,13 59:18
  64:11,19,22
  69:16
**rising** 30:20
**risk** 6:7 24:25
  40:11 43:1
**risks** 5:20 6:12
  6:13,14,25
  23:6,10,17
  28:14 42:24
  44:10 54:15
  60:21 61:20
  67:4,5
**RKA** 1:5
**Road** 2:5
**rotting** 24:4
**Roy** 41:10
**Rule** 2:23 60:9
  60:10 64:14,15
**run** 21:16 41:6

_____
**S**
**Salem** 2:3,16 3:6
  3:7 10:1 14:11
  22:4 27:17
  32:1,17 33:8
  36:2 39:14
  46:20 52:23
  55:19 56:2
  58:17 64:17
  65:3,17 67:14
  67:17 68:4
**Samantha** 11:19
  19:25 61:15
**sank** 29:9 33:17
  36:15,17 53:25
  56:24
**Sarah** 11:18
  12:12 18:21
  19:18,23 50:17
  50:19 61:14,16
**saw** 31:22
**saying** 57:2,7
**says** 30:18 43:15
  44:2,12 49:5
  53:5 55:4
  57:11 60:15

62:25 66:14
  69:6
**scheduled** 9:2
  25:13 38:4
  39:7 44:12
  49:14
**School** 8:1
**schooling** 8:15
**Scottish** 6:11
**screen** 8:19,21
  38:8,9,17
  39:23 43:21
  47:24 50:7,8
  52:25 56:6
  60:4 65:9,10
**scroll** 38:11 53:7
**seal** 70:11
**search** 41:2,14
  41:22,23,25
  42:2,20,21
  43:2,8,10
  44:16 47:16
  48:20
**searched** 42:3,3
**searches** 42:11
**searching** 44:24
**seawater** 31:11
**seaworthiness**
  36:12 37:15,17
  37:21 38:21,23
  39:4
**seaworthy** 36:9
  37:18 38:5
  39:3,7
**second** 29:10
  33:9 38:2,19
  66:11
**section** 21:15
  58:19 59:6,9
  59:11,18
**secure** 15:20
**Sedgwick** 13:16
  13:18,20 15:17
  17:12,18,18
  30:13 33:7
  54:20 64:1
**see** 8:20 15:5

16:3 17:8
18:14,15,16
30:17 38:9,11
41:6 42:6,22
44:21 48:12
50:8 53:22
65:9 66:11,15
69:9
**seeing** 53:13
**seek** 13:6,7,8
17:8 18:4,18
18:20 51:16,25
**seeking** 51:4
**seen** 42:13
**sees** 19:21
**senior** 18:24
**sent** 16:12 18:8
21:22 29:4
66:10,22 68:25
**separate** 21:15
58:22
**September**
13:19 20:5,21
27:9,20 28:3,4
28:7,9 29:8,11
29:17 36:20
53:17,21 54:8
63:12
**series** 4:9
**server** 9:14
21:16
**serviced** 30:4
**settling** 31:23
**severely** 53:18
**share** 8:19 38:8
43:21 50:7
60:2 65:9
**shared** 65:10
**sharing** 39:23
47:24
**short** 14:14
26:10
**shorthand** 71:7
71:12
**show** 30:14 56:3
65:25
**showed** 33:24

63:23
**showing** 38:12
45:21
**signed** 50:17
67:3
**signing** 69:22
71:9
**Simms** 11:19
12:13 18:21
19:19 50:17,20
61:14,17
**Simms'** 12:14
**simple** 31:7 41:8
**simply** 33:14
36:8,17 41:5
50:6 68:7
**single** 31:25
**sink** 36:16 57:4
57:6
**sinking** 21:1
29:7,11,16,21
30:11 33:10
53:18,20 54:5
54:8 57:8,8
**sir** 3:7 8:23
**site** 19:9
**sitting** 31:12,24
**situation** 42:25
**six** 36:24 50:24
**sixth** 47:25 57:9
**size** 42:9
**solely** 52:12
**somebody** 11:15
19:13 21:22
26:19 42:23
46:13 50:20
**sorry** 4:15 21:12
24:20 39:9
57:25 60:7
**sort** 4:15 16:17
43:9 46:23
**sought** 18:5
**source** 31:4
**SOUTHERN**
1:2
**space** 31:1
**speaking** 42:20

**speaks** 54:10
**special** 5:20 6:6
6:12,13,14,25
23:6,10,16
28:14 31:22
44:10 54:15
60:21 61:20
67:4,5
**specialists** 54:19
**Specialty** 7:9,13
**specific** 23:8
34:24 53:15
**specifically**
60:25
**specify** 22:5
**speculate** 37:10
**speculated** 30:16
**spell** 7:11
**SPRING** 1:6
**Springs** 5:15,25
7:4 12:25 13:5
13:10 15:11
17:4,5,13,20
17:20,23 20:14
21:23 22:9,13
22:21 23:3,5
26:17 28:13
30:10 33:3,12
33:21 34:10
35:19 48:1,7
48:13 49:21
51:1,23,24
52:1,1,5,12
53:24 54:7,15
54:17 55:7
56:9 57:13
58:1 59:16
63:18 65:13
**Springs'** 2:22
18:3,6 36:18
47:4 50:23
55:22,24 60:10
**SS** 71:2
**St** 7:25
**staff** 6:15 7:19
11:21
**stage** 17:25 24:5

**stagnant** 31:1
**standard** 66:18
**standing** 24:4
34:1
**starts** 59:10
**state** 1:23 3:9
8:25 22:5
50:13 70:4,16
71:2,6
**stated** 17:2 33:1
33:9 36:3
37:25 39:24
47:1,25
**statement** 51:8
**states** 1:1 8:9
18:25 49:14
53:16
**statistics** 6:4
**Ste** 2:10
**steep** 31:4
**step** 17:10
**stop** 39:23 47:24
**stored** 32:6,8,10
**storm** 36:15
57:1
**strike** 4:16 57:1
68:17,17
**striking** 33:14
**strong** 42:10
**structural** 6:13
**style** 44:23
**subcontractors**
54:18
**subject** 19:3
67:3
**subjected** 31:7
**submerged** 20:9
20:13 21:2
31:12 33:15,25
68:18
**submission**
40:21
**submit** 26:3
**submitted** 29:24
40:2,5 43:22
46:10 47:1,13
47:21 60:16

66:9
**submitting**
41:24
**subsections**
59:18
**subsequent** 26:9
57:22 58:8
**subsequently**
59:19 69:1
**subsidiary** 7:6
**suffered** 24:2
29:7,11,16
30:1 33:10
35:19 39:25
40:6,20 47:3
**suggest** 13:5
37:8
**suit** 71:15
**suitable** 39:8
**summation**
31:16
**sunk** 20:12
**supervise** 6:22
6:23,24 7:17
**support** 30:11
**suppression**
30:4,7 48:3,9
48:15,22 49:3
49:6,10
**sure** 3:19 4:8
21:12 50:18
64:24
**surf** 41:6
**survey** 14:22
15:1 16:1,9
21:10,25 22:5
24:16,23 25:1
25:2,3,5,7,10
25:12,14,15,17
25:19,20,25
31:3,17 34:14
35:9,15,21
45:14,16 55:12
62:17,19,23
63:5
**surveyed** 15:6
21:8,9,18

34:14
**surveyor** 10:9
14:7,20 15:13
15:14 16:15,25
17:11,17 19:4
21:21 31:22
32:13,15 35:2
35:4
**surveyor's** 14:23
**surveys** 25:23
34:17 55:9
**sustained** 63:20
**switch** 30:23,24
**sworn** 3:3 70:9
71:9
**SYP/8/PPO**
66:15
**system** 30:4
42:10,22 46:11
48:22 49:3
**systems** 30:7
48:3,9,15
49:10

**T**
**T.L** 6:9
**tagged** 30:5 34:6
48:4 49:8
**tagging** 49:18
**tags** 30:6 49:5,18
**take** 4:12,14,24
9:2 15:25 16:4
16:8 21:15
27:13 42:10,11
**taken** 1:22 3:16
16:3,7 25:17
27:16 55:18
**talking** 19:8
44:24
**tank** 24:3,5
31:10 63:15
**team** 11:10
**tear** 24:11 29:17
33:19 35:19
40:9
**telephone** 20:18
**tell** 5:17 10:2

13:6,14 15:7,8
16:2,5,11 20:3
28:8 29:2 32:6
33:20 37:24
59:8 61:15
63:10 66:8,17
67:1 68:21
69:3
**tells** 59:22
**ten** 40:15 68:11
68:20
**tender** 19:2
**term** 31:10,20
**test** 31:7
**testified** 3:4,22
3:24 4:16 52:8
**testify** 4:1
**testimony** 5:7,10
5:14 59:16
**Texas** 6:10,10
**thank** 65:3
**thereof** 71:16
**things** 17:2 34:8
35:21 56:17,18
**think** 3:18 11:21
14:20 15:12
17:10 23:1
25:16 48:11
51:4 63:4,5,12
63:14 64:4
69:7
**thinks** 14:25
**third** 33:18
56:15
**Thirdly** 29:15
**Thomas** 11:18
11:19 19:20,21
19:25 61:15
**thousands** 41:13
**three** 25:24,25
55:15
**tide** 30:25 31:22
31:23,25 32:12
32:21 34:4
35:23 36:23
37:8
**time** 18:11 20:22

20:23,25 25:2
25:21 29:20,22
29:23 31:24
32:4 37:2,7,9
39:16 40:25
42:11,12 45:4
47:15 48:9
55:13 59:3,25
60:1 63:2
64:18,20 65:2
65:3
**timely** 54:11,13
**times** 3:14,15,24
38:5 54:23
**timing** 54:11
**today** 3:20 4:9
4:13 5:4,7,12
5:14 9:3,5,12
10:3 11:10,14
12:4 23:9
37:21 38:13
39:16 51:1
55:2,7 56:12
56:18 59:16
60:13 64:11
**today's** 10:21
11:7,10 12:1
53:11
**told** 45:14
**Tony** 61:3,5,6,8
**top** 13:25 44:6
**total** 7:19 64:4
**touch** 7:23
**traditional** 68:5
**traffic** 10:17
**training** 8:14,17
**transact** 19:16
**transcript** 69:16
71:12
**transferred**
22:21 28:17
**trial** 3:22,24 4:2
4:5,5
**true** 54:2 63:3
63:18 71:11
**truth** 5:4
**truthfully** 29:25

39:25 47:2
67:12
**truthfulness**
57:21
**try** 42:12
**turn** 62:11
**turned** 24:3
**Twenty** 3:25
**two** 3:17 25:23
26:1 30:19
35:25 40:13
41:5,17 43:1
43:20 55:15
61:11
**type** 46:13
**types** 4:1 10:7,13
**typically** 44:20
52:12 55:8

**U**
**U-S-H-E-R** 3:12
**U.S** 14:8
**UK** 20:23
**Ultimately** 57:4
**undersigned**
70:7
**understand** 4:19
5:2,3 48:11
**understanding**
5:11
**understood** 4:18
18:21 20:3
**underwrite** 23:3
**underwriter**
43:7 60:22
61:6
**underwriters**
7:10 42:21
**underwriting**
4:7 5:24 6:2,12
8:15 10:6,12
11:13 12:7
42:14,16 44:17
44:19 47:16
48:18 60:23
65:7,14 66:1,7
66:25 68:22

**underwrote** 7:5
7:7 23:18
**unfamiliar**
62:10
**unfettered** 31:13
**Unfortunately**
41:12
**unique** 45:5
**United** 1:1 8:5,9
18:25
**unravel** 48:12
**unseaworthy**
29:21 36:4,5
36:19,20,22
37:5,7,9,11,16
**use** 22:7 25:21
39:9 52:12,15
52:17
**Usher** 1:20 2:15
3:2,12 65:6
69:15 70:10
71:8

**V**
**vacation** 20:7
32:4
**value** 64:5,10
**various** 10:18
36:12 52:15
**veracity** 57:12
**verbally** 4:11
**version** 42:7
66:19
**vessel** 14:21 15:4
15:6 16:23
19:9 20:8 21:6
22:6,9,19 23:8
24:2 25:24
29:7,9,11,16
29:21,25 30:4
30:19 31:3,12
32:6,7 33:10
33:16 34:1,2
34:14,16 35:2
36:4,5,9,13,15
36:17,19 37:4
37:11,16,18

38:4 39:7,20
39:25 40:6,23
41:25 42:4
43:10,15 44:12
45:4,6,25 47:3
48:20 49:4,14
53:20,24 54:8
55:1 56:24
57:4,6 62:20
63:2,20 64:6
**vessel's** 30:6
31:10 39:3
**vessels** 34:14
36:8
**visit** 16:22
**visited** 14:21
17:5
**voice** 11:2
**void** 30:8 38:7
**voided** 37:13
**volume** 19:15
**Vs** 1:9

**W**

**W** 2:10
**wait** 21:17
**waive** 69:18,20
**waived** 69:23
71:10
**Wales** 19:1
**want** 14:12
17:23 52:8
53:14 64:24
69:21
**warranted** 38:4
49:16
**warranties**
34:22 49:25
**warranty** 38:2,3
38:6 48:18
50:6
**wash** 31:11
**Washburn**
20:16 62:9
**wasn't** 4:5 20:24
21:12
**water** 24:4 30:17

31:2,4,6,7,10
31:12,13,19,23
32:10,11 33:17
34:1 45:15
56:25 57:8
**way** 18:9 43:13
48:20,23,24
63:4
**wear** 24:11
29:17 33:19
35:19 40:9
**weather** 36:15
**Wello** 1:10 3:9
41:9,11,15,16
54:12,24 58:25
59:4,24 62:8
62:20 67:8
**wells** 30:25
31:11
**Williams** 62:9
**Wilson** 20:16
**wish** 13:7,11
18:4
**wished** 17:8
**witness** 3:3 4:3,4
4:6 63:1 69:19
70:11 71:8
**word** 56:19
**wording** 66:15
**work** 7:15 17:14
21:20 26:25
61:8,10 62:2
**worked** 6:6
**working** 19:13
49:17
**works** 12:18
61:16 62:2
**worthwhile** 51:4
51:16
**wouldn't** 31:25
**write** 7:8 46:1,3
**writing** 22:25
**written** 23:7,15
23:21 26:8
35:12 40:6
41:4,7,8 42:19
43:4,5 44:6

67:22
**wrong** 63:4
**wrote** 23:20 26:5

**X**

**X** 2:14
**XSK** 44:13

**Y**

**yacht** 66:18
**year** 22:17 23:18
23:20 49:18,18
62:16
**year's** 47:19
**years** 3:18 8:17
10:22,25 25:24
25:25 26:1,9
35:25 40:15

**Z**

**ZOOM** 1:17

**0**

**1**

**1** 2:20 9:23,24
38:25,25 71:11
**1:21** 1:5
**10** 59:11
**10:00** 1:16 9:3
**10:29** 20:23
**100** 7:6
**11** 55:4
**11:00** 27:15
**12** 36:25 38:2,15
**12-month** 26:12
**12:20** 1:16 69:23
**13** 49:13
**130** 42:24
**13th** 62:9
**14** 32:16 59:13
59:17
**142-page** 65:12
**15** 25:4 59:10
68:11,20
**169671** 42:8
**1729** 20:21
**18** 36:25

**18-year** 23:23
**183,480** 44:23
**19** 1:15
**190530B** 66:12
**1999** 6:8,16,21

**2**

**2** 2:20 39:11,12
45:11 60:14
65:25 66:5
**2003** 7:7
**2013** 6:12
**2016** 23:22 24:2
24:7,15,19,21
25:4 30:1 40:1
40:6 41:1,19
43:17 47:3,21
62:18,22 63:6
63:10,11,12
65:22 67:12
68:2
**2016-year** 51:13
**2017** 23:22,23
24:22
**2017-2018** 24:6
**2018** 23:21
24:23 25:1,6
26:5 40:5,12
40:22 41:22,22
42:9 47:9,11
47:20 65:7,13
65:18 66:1,1,8
67:1,16 68:22
69:3
**2018-year** 60:19
**2019** 21:10,19
22:1,6 23:19
23:21 24:16
25:6,12 30:5
35:4,9,14,16
35:21,25 42:6
48:4,22 62:19
62:23 63:7
**2019-2020** 25:8
**2020** 7:7 23:2,14
23:19 25:9,10
30:7 48:10,16

49:4,21
**2021** 13:19
16:20,21 20:5
20:21 22:11,14
22:17 23:13,14
25:10,14,15
26:2,15 27:9
27:20,23,24
28:2,4,7,9 29:5
36:20 40:2
43:23 44:21
47:2 49:23
50:15 52:4
53:17,21 54:8
61:1,12
**2021-22** 28:1
**2022** 1:15 22:11
25:19 43:23
45:15 70:12
71:18
**21st** 29:25
**22** 7:19
**22nd** 16:18
**230,000** 64:10
**230,871** 39:22
**24234** 1:5
**26** 2:23 23:22,22
24:19,25 60:9
60:10 64:14,15
**2600** 2:5
**27** 20:5 24:25
27:9,20,24
28:3,7,9 36:20
53:17,21 54:8
**27th** 20:20 28:2
28:4 29:8,11
29:17 62:22
**28th** 13:19 20:24
70:11 71:17
**29th** 21:19

**3**

**3** 2:16,21 21:3,5
39:1 46:6,17
46:18 50:15
52:4 66:5
**3/27/2024** 71:24

| | | | | |
|---|---|---|---|---|
| **3/27/24** 70:17<br>**30** 3:18 8:17<br>**300** 3:17,18<br>**30th** 66:10<br>**31** 22:11,11,14<br>   22:17 23:2,13<br>   23:14,14,19,19<br>   23:20,21 24:23<br>   25:19 27:23<br>   28:2 45:15<br>**33134** 2:6<br>**33324** 2:11<br>**39** 2:20<br>**390530** 42:7<br>**390530A** 66:13<br>**3rd** 29:5 | **9** 2:20 62:25<br>**941432** 70:17 | | | |
| **4** | | | | |
| **4** 2:21 52:20,21<br>**404** 2:10<br>**449,320** 44:22<br>**46** 2:21 | | | | |
| **5** | | | | |
| **5** 2:22 55:22,24<br>**5:29** 20:21<br>**52** 2:21<br>**55** 2:22<br>**58** 2:23 | | | | |
| **6** | | | | |
| **6** 2:23 58:13,15<br>   63:12<br>**63** 66:7<br>**64** 2:23<br>**65** 2:16 66:25<br>**675** 68:20 | | | | |
| **7** | | | | |
| **7** 2:23 64:14,15<br>**71** 71:11<br>**73** 69:3<br>**76** 68:21 | | | | |
| **8** | | | | |
| **8751** 2:10 | | | | |
| **9** | | | | |